**Gilbert H. RIVETTE, Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE and William F. Bolger, Postmaster General, Defendants.**

**No. 84CV4078.**

United States District Court, E.D. Michigan, S.D.

Jan. 6, 1986.

Douglas L. Webster, Southfield, Mich., for plaintiff.

Patricia G. Blake, Asst. U.S. Atty., Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiff Gilbert Rivette is a white male who instituted this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16, alleging that he was the victim of racial discrimination in the course of his employment with the United States Postal Service. Specifically, he claims that on account of his race he was denied promotion to the position of Director of Mail Processing at the Detroit Management Sectional Center (MSC). Plaintiff requests relief in the form of retroactive promotion, back pay and benefits.

Plaintiff has been employed by the Postal Service since 1942. At the time the complaint was filed, he had thirty-seven years of service, with six years experience in the grade 24 position of Manager-Distribution at the Complex General Mail Facility in Detroit.

In March of 1979, a vacancy announcement was issued for the grade 26 position of Director of Mail Processing. Ten Postal Service employees, including plaintiff, applied for the job. Seven of the applicants were white; three were black. A Pro-

motion Review Board (PRB) consisting of three whites and one black convened to consider the applicants. The PRB concluded that there were no "well qualified" candidates for the position, but submitted three names as "best qualified", none of whom was plaintiff.

The selecting official, Manager/Postmaster Joseph Loukotka, decided not to hire any of the three candidates identified by the PRB. Instead, the vacancy announcement was reposted in August of 1979 with the additional requirement that the applicant "demonstrate through education and/or experience an understanding of engineering or business administration." Eleven employees, including plaintiff, applied for the job. Nine of the applicants were black; two were white.

A second Promotion Review Board, consisting of three blacks and one white was convened to evaluate the applicants and recommend candidates for the position. All eleven applicants were interviewed on September 24, 1979. The second PRB recommended three applicants as "best qualified:" Terry Arnold (white); Charles Brazelton (black); and Ruben Fowlkes (black). Again, plaintiff was not recommended as a finalist. Manager/Postmaster Loukotka selected Ruben Fowlkes for the position on October 31, 1979.

The parties' joint pretrial statement and evidence presented at trial clarified that plaintiff is not alleging that the selection process of the first PRB was tainted by discrimination. In his opening statement at trial, plaintiff's attorney articulated the theory that the decision of postal officials to fill the Director of Mail Processing position with a black candidate was made in June of 1979, between convening of the first and second PRB's.

Plaintiff claims that the decision to hire a black for the position at issue was the result of a series of events beginning prior to the posting of the first vacancy announcement. At trial, plaintiff described the Detroit postal facility as operating in an atmosphere of racial unrest. He testified that three major letter-sorting machines had been removed from Detroit and relocated at the Airmail facility in the suburb of Romulus, which necessitated the transfer of a number of employees and resulted in the perception that the Post Office was taking jobs away from black employees in the City of Detroit. In addition, the District Office had been moved from the downtown Detroit post office to the suburb of Southfield and, as a result of alleged discrimination in promotions at the management and supervisory levels, a group of black employees had filed a class action against the Post Office in April, 1979.

Plaintiff claims that pressure placed on the Regional Postmaster General by a number of prominent black Detroiters who voiced their support of the class action resulted in the decision to fill the position with a black candidate in order to ease racial tensions. He alleges that the decision to hire a black was communicated to the members of the PRB, thereby tainting the selection process and resulting in discrimination against him because of his race.

As evidence of racially discriminatory considerations, plaintiff alleges a number of improprieties and irregularities. His first claim is that in contrast to the customary practice at the Detroit facility of using promotional boards consisting of three members, the PRB which evaluated the applicants for the Director of Mail Processing position in September, 1979, had four members. In addition, plaintiff claims that the process by which the PRB was designated was in contravention of Post Office regulations which specify that promotion review board members should be selected by the District Manager. Plaintiff alleges that in this case, the PRB members were designated by the Regional Postmaster General. Plaintiff also contends that the decision of the PRB was contrary to Post Office guidelines which suggest that "[g]reater weight should be placed on what an individual does, or has done than on what he or she may say in a brief interview." Plaintiff argues that in view of his

experience and past performance, which he felt rendered him the most qualified applicant, the PRB unfairly overemphasized his performance at the interview." Further, he states that the PRB failed to establish or announce any written criteria or rating system upon which the candidates were to be evaluated. He notes too that the PRB submitted the names of only three candidates when Post Office regulations allow for the submission of up to five finalists.

Plaintiff claims that because a change in a job description cannot occur without approval by the Postmaster General, the additional requirement of an engineering or business administration background incorporated into the second vacancy announcement is further evidence of an officially orchestrated plan to award the position to a black candidate. He draws additional support for his allegation of an official scheme from the selection by the PRB of Terry Arnold as a finalist for the position. Mr. Arnold, the only white candidate recommended, was thirty-four years old at the time of the interview and worked for the Postal Service in Iowa. Plaintiff contends that Mr. Arnold was purposely chosen as a "token" finalist because it would have been impossible for him to fill the position under the existent conditions. He argues that in addition to Mr. Arnold's inferior credentials, his youth, his race and his "blonde hair," the fact that he was from outside the Detroit area would have made his appointment to the position unfeasible as it would have engendered even further resentment on the part of disgruntled black employees.

Plaintiff cites his treatment at the interview as additional proof of discrimination. He alleges that despite his having acted in the capacity of Director of Mail Processing during the Director's vacations and other time off, he was not questioned by the PRB about that experience. Moreover, plaintiff avers that when he attempted to pass out some supplementary written materials detailing his achievements to the Board members, Mr. Bates, the Chairman, became extremely irritated and refused to allow the dissemination. Plaintiff testified that from that point, Mr. Bates and the other Board members were hostile and combative toward him.

Finally, plaintiff notes that Ruben Fowlkes, the candidate who was awarded the position, lied about his academic credentials on his application. Mr. Fowlkes represented that he had a college degree in engineering when in fact, he did not. Plaintiff maintains that the PRB members knew or should have known that Mr. Fowlkes had falsified his application.

There is no question that Title VII prohibits racial discrimination against all groups. *McDonald v. Santa Fe Trail Transportation Company*, 427 U.S. 273, 276, 279, 96 S.Ct. 2574, 2576, 2578, 49 L.Ed.2d 493 (1976). The Sixth Circuit has recently clarified, however, that cases of "reverse discrimination" must be analyzed within the historical context of the Act. *Jasany v. United States Postal Service*, 755 F.2d 1244, 1252 (6th Cir.1985); *Murray v. Thistledown Racing Club*, 770 F.2d 63, 67 (6th Cir.1985). "The primary purpose of Title VII is 'to assure equality of employment opportunities and to eliminate those discriminating practices and devices which have fostered racially stratified job environments to the disadvantage of *minority* citizens.'" *Murray*, at 67, quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973) (emphasis added). Although "[w]hites are also a protected group under Title VII, ... it defies common sense to suggest that the promotion of a black justifies an inference of prejudice against white co-workers in our present society." *Parker v. Baltimore and Ohio Railroad Co.*, 652 F.2d 1012, 1017 (D.C.Cir. 1981); *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C.Cir.1983).

The general standard for establishing a *prima facie* case of disparate treatment which was set forth in *McDonnell Douglas v. Green*, must therefore, be modified to reflect the context of a reverse discrimination claim and the reverse discrimination claimant "bears the burden of demonstrating that he was intentionally discriminated

against 'despite his majority status.'" *Murray*, at 67, quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), and *Lanphear*, at 1315.

> [A] prima facie case of "reverse discrimination" is established upon a showing that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority," (citations omitted); and upon a showing that the employer treated differently employees who were similarly situated but not members of the protected group. (Citations omitted).

*Murray*, at 67, quoting *Parker* at 1017; *Daye v. Harris*, 655 F.2d 258 (D.C.Cir. 1981); and *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C.Cir.1981).

▮ Applying the standard adopted by the Sixth Circuit, this court finds that plaintiff has failed to establish a *prima facie* case. One method employed by the courts to analyze whether background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority, has been to inquire into the consistency of the procedures used by the defendant in the disputed case compared to those routinely used. In *Daye v. Harris*, 655 F.2d 258 (D.C.Cir.1981), the court found such irregularity of procedures persuasive evidence of a *prima facie* case of reverse discrimination directed at a white nurse by her employer. The claimant in *Daye* had presented evidence that hospital officials undertook a campaign to simultaneously increase a black candidate's Qualifications Review Board scores by granting her favorable work experience and awards, while reducing the scores of her closest white competitors by downgrading their performance evaluations. The plaintiff further presented a chart showing that black nurses at the hospital received a disproportionate number of promotions.

Plaintiff in the case now before the court has made no such showing. Although he alleged a number of improprieties and deviations from customary procedure, the evidence presented at trial disproved the allegations. Plaintiff's contention that the second PRB was composed of four members, while the first Board had only three, collapsed when, upon being confronted with the defendant's evidence to the contrary, he admitted that the earlier board in fact, also consisted of four members. He further admitted that he had not complained about the number of members on the first board. His belief that review boards in the Detroit area were customarily comprised of three members was based on his own experience in serving on such boards, but plaintiff confessed that he had never served on a board recommending candidates for a level 26 position and therefore, had no idea what the custom was in that context. Moreover, the Postal Bulletin which sets forth policies and procedures governing the filling of nonbargaining unit positions, states that "[a] review committee of *at least three* members [be] established to recommend to the selecting official the best qualified candidates for each vacancy." (emphasis added) Thus, the fact that the PRB consisted of four members was not an irregularity and fell squarely within Postal Service regulations.

Plaintiff's allegation that the selection of the PRB members was improper is likewise without merit. Plaintiff claims that the board members were selected by the Regional Postmaster General rather than the District Director as required. The evidence, however, indicates otherwise. A letter from the Regional Postmaster General, addressed to the District Director, clearly indicates that the District Director had submitted the names of his board choices to the Postmaster merely for his approval. The *selection* of the board members was made by the appropriate official, the District Director.

The allegation that the additional requirements of an engineering or business administration background reflected a conspiracy on the part of officials to tailor the position to Mr. Fowlkes is equally baseless. Plaintiff argues that such changes could not be made without approval and involve-

ment of the Postmaster General. The evidence demonstrated, however, that the position description itself was never changed. It had always required a "graduate level understanding of engineering or business administration ... acquired through formal schooling or training." Further, Mr. Witter, one of the members of the second PRB who has forty years of service with the Postal Service and had served on many review boards in the past, testified that local officials have the authority to add requirements or qualifications from the position description to the vacancy announcement. Therefore, the second vacancy announcement in this case merely reflects a more thorough culling out of the qualifications already established by the position description than had the former announcement.

Nor is it persuasive that the PRB submitted only three names to the selecting official rather than five. Again, the Post Office Bulletin which outlines review board procedures indicates that the PRB's submission of only three names was entirely consistent with regulations which specify that "[t]he committee is required to recommend at least three, but no more than five, best qualified candidates." Furthermore, each of the three PRB members who testified at trial, independently articulated that the reason three names were submitted was because there was unanimity as to those applicants and no others. Each Board member had rated the three recommended candidates in his list of the top five. Beyond those three, the Board disagreed.

Plaintiff produced no statistical evidence at trial to indicate that either the Postal Service in general or the Detroit MSC administrators discriminate against white employees. His trial brief contained unsubstantiated statistics, (actually offered to support a separate and irrelevant proposition), which were useless in evaluating his claim. Plaintiff listed the number of black and white employees promoted to level 17 and above in all Detroit offices for the years 1978 through 1981. Those figures indicate that in 1979, an equal number of blacks and whites were promoted to level 17 or above. In 1980 and 1981, considerably more blacks were promoted at the upper levels than whites. Plaintiff has failed, however, to provide any statistics on the racial make-up of the Detroit offices as a whole. Thus, the court has no way of determining whether the increase in promotions of blacks at the upper levels was in any way disproportionate. Demographic changes over the years might well have led to an increased number of black employees at all levels working in the City of Detroit, while white employment figures within the city dwindled as they opted to work in suburban locations. Were this the case, there would be nothing unusual in an increase in black promotions. In any event, these unsubstantiated and incomplete statistics fall far short of demonstrating that plaintiff was "intentionally discriminated against despite his majority status" and the court will not speculate as to their import.

Similarly, plaintiff's allegations that the class action suit filed by black employees challenging Postal Service promotion policies led to a conspiracy to hire a black for the position is unfounded. While the institution of the class action, as well as other evidence presented at trial, do indicate dissatisfaction on the part of black postal employees in the Detroit area, there is no indication that this circumstance played any role in the PRB's selection of finalists for the job plaintiff sought.

Of the three PRB members who testified at trial, two were completely unaware of any racial tension. Both Mr. Witter and Mr. Bates were from the Chicago area and both testified that they had no knowledge whatsoever of the existence of the class action or the alleged "unrest" in the Detroit Post Office. Mr. Perkins, the General Manager of the Bulk Mail facility in Allen Park, testified that he was aware of the class action and the general controversy regarding management level promotions at his suburban facility, but felt he needn't consider it because he was under the impression that it was not a problem at the downtown Detroit MSC. He further testi-

fied that he did not discuss the class action with any of the PRB members and that race was never mentioned. All of the PRB members who testified unequivocally stated that race had no bearing on their decision and that they were not pressured by anyone to chose applicants of a particular race.

As additional evidence that improper racial considerations colored the judgment of the PRB, plaintiff attempted to demonstrate that the selection of Terry Arnold as a finalist represented tokenism. The gist of plaintiff's theory is that the PRB knew Mr. Arnold could not be awarded the position, but nevertheless chose him as a finalist in order to disguise their discriminatory intent.

Again, the evidence contradicts plaintiff's allegation. First, as mentioned above, the PRB members could not have contemplated that the races of the selectees would matter to anyone because they were unaware of any racial problems at the Detroit facility. Contrary to plaintiff's assertions, the Board members testified that Mr. Arnold's current status at level 20 did not preclude him from consideration for the level 26 position. Regulations permitted employees within six grade levels to apply for the job. Nor did any of the Board members testify to a knowledge of resentment against outsiders.

In addition, the testimony established that Mr. Arnold was considered a highly qualified candidate by the entire PRB. Although he was viewed as somewhat young by one member, Mr. Arnold apparently possessed exceptional interpersonal skills. As Mr. Perkins testified, the position required the ability to deal with people, and based on the interview, he was convinced that Mr. Arnold could handle the job. Mr. Witter described Mr. Arnold as direct, knowledgeable, informative, imaginative and prepared for the interview. He testified that unlike plaintiff, Mr. Arnold's responses to questions were aimed at convincing the interviewers that he knew the job. His demeanor was characterized by Mr. Witter as pleasant, confident and businesslike.

Mr. Bates, as well, testified that Mr. Arnold was highly qualified and had a realistic chance of being selected for the position. He noted that Mr. Arnold had been evaluated as the best sectional director of mail processing in Iowa at the time, had been a management trainee which meant that he had diverse experience, had served as a district director of mail processing and had exposure to large operations. In fact, Mr. Bates testified that if the ultimate selection had been up to him, he would have chosen Mr. Arnold for the position.

In his closing argument, plaintiff's counsel posited the theory that Mr. Arnold's eventual promotion to Director of Mail Processing in Iowa was somehow a reward for his silent cooperation in an orchestrated plan to discriminate against plaintiff. The court notes that based on the testimony presented, quite the contrary is more likely true. A far less contorted interpretation of his promotion is that Mr. Arnold was rewarded for his well-documented abilities rather than his sheepish compliance with a purportedly discriminatory plan of which he undoubtedly knew nothing.

Plaintiff's allegation that Mr. Bates' refusal to accept his supplementary documentation is evidence of racial animus was also discredited. Mr. Bates testified that his refusal was an attempt to *equalize* the opportunity provided to each applicant interviewed. He explained that he thought it inappropriate for plaintiff to present such material at the interview and that the proper method of submitting it would have been to include it with his application. He vigorously denied throwing the papers back at plaintiff and testified that he did not notice whether plaintiff was upset. Nor did the other Board members observe any distress on plaintiff's part regarding the incident. Plaintiff's testimony that in his own experience as a review board member it was not unusual for an applicant to bring written materials to the interview and that in such situations he had always accepted them is irrelevant. Such an assertion has no bearing on Mr. Bates' motive in refusing plaintiff's documents and, as noted above, plain-

tiff had never served on a board selecting candidates for a level 26 position, so his beliefs as to the custom in this context are mere speculation.

Plaintiff's assertion that there were no written criteria or standards for evaluating the applicants is untrue. The position description itself, which is six pages long, details the responsibilities and requirements of the job. This information, coupled with the experience of the individual board members who were all high level managers, provided the framework for evaluation. The PRB members testified that each asked every candidate questions in his own field of expertise and evaluated their answers in light of his own experience. A numerical rating system by category was not required.

Finally, plaintiff argues that the Board knew or should have known that Mr. Fowlkes lied on his application when he stated that he had a degree in engineering. This allegation too is unsupported by the evidence. Each of the Board members testified that he did not look at the personnel files of any of the applicants. Only the applications of those persons facially qualified for the position were sent to the PRB, for interviews. And, as Mr. Bates testified, even if they had examined the personnel files, it is not certain that the misrepresentation would have been discovered. Although the personnel files would have been available had the Board requested them, they were apparently under no obligation to do so. Regardless of what was discovered later, it is the Board's state of mind at the time it made its selection that is at issue and there is simply no evidence to suggest that any member was aware of the falsehood.

There being no showing to support the suspicion that the Postal Service is that unusual employer who discriminate against whites, plaintiff has failed to meet the first prong of the test of a *prima facie* case. Neither has he met the second prong by showing that his employer treated differently employees who were similarly situated but not members of the protected group. The applicant whose length of service and type of experience most closely resembled plaintiff's was a black candidate, Will Gray. Like plaintiff, Mr. Gray had served many years in the Postal Service and applied for the position the first time the vacancy was posted. Like plaintiff he reapplied in September of 1979. Mr. Gray was among the top five choices of only two of the Board members. Plaintiff was within the top five of only one Board member. Neither plaintiff nor Mr. Gray was chosen as a finalist, thereby indicating that the most similarly situated of plaintiff's competitors who was not a member of the protected group was treated exactly as plaintiff.

■ The court finds that plaintiff has failed to establish a *prima facie* case. Even if he had succeeded with the first phase of proving a case of disparate treatment on the basis of race, he has failed to rebut the defendant's legitimate, nondiscriminatory reason for the decision to exclude him from the list of finalists. It is noteworthy, here, that plaintiff's entire case presumes that, if he had been a finalist, he would have been awarded the one vacancy by the appointing authority. That assumption cannot be made.

Overwhelming evidence was presented indicating that plaintiff was dismally deficient in the required areas of human relations and communications skills. Plaintiff contends that contrary to regulations, his performance at the interview was overemphasized. He repeatedly argued at trial that in order to function competently in the position that he currently held, he would necessarily have been proficient in interpersonal skills. This assertion was rebutted by both Mr. Bates and Mr. Witter who noted that simply performing in a job for a long time does not necessarily mean the requisite skills have been acquired for higher management. Mr. Bates testified that based on a 1979 report, the Detroit office had exhibited "woefully poor performance" and concluded that if plaintiff had been a long-time effective administrator, the office would have been in better shape all along,

and that a recent upsurge in productivity should not be attributed to plaintiff.

Although the guidelines clearly require a review board to base its decision on more than the interview alone, it is equally apparent that a disastrous interview could easily preclude a candidate from consideration for a high level position necessitating well-developed human relations skills, especially in light of the fact that all of the candidates interviewed met minimum technical qualifications for the job. Each of the Board members testified that plaintiff appeared extremely nervous during the interview. Mr. Witters described plaintiff's answers to technical questions as vague, indirect and evasive. He noted that plaintiff seemed unprepared for the interview and opined that this seemed to be the result of an attitude that he didn't need to prepare because he was "heir apparent" to the position.

Mr. Bates stated that he was looking for poise, leadership qualities, team-building ability and problem-solving skills in the applicants, but found plaintiff lacking in all. In response to one question posed by Mr. Bates which was aimed at eliciting the quality of an applicant's skills in these areas, plaintiff responded that he would do whatever he was told. The response understandably indicated to Mr. Bates that plaintiff was passive and lacked initiative. Other responses indicated that plaintiff was unwilling to credit others for their performance. Considering the complexity of the operation that the eventual selectee would supervise, the level of responsibility and the multitude of decisions that would be required of him, it is not surprising that plaintiff was not selected as a finalist. Clearly, despite his length of service and experience, the decision to exclude him was based not on his race, but on his failure to meet the required qualifications for the job.

Therefore, IT IS HEREBY ORDERED that plaintiff's complaint must be dismissed.

IT IS SO ORDERED.