Fred **LEMNITZER** and Ken Green, Plaintiffs,

v.

**PHILIPPINE AIRLINES, INC., Defendant.**

No. C–90–2262 DLJ.

United States District Court, N.D. California.

Nov. 10, 1992.

Lawrence Ball, and Louis A. Highman, San Francisco, CA, for plaintiffs.

Cynthia E. Gitt, with Epstein, Becker & Green, Los Angeles, CA, for defendant.

## ORDER

JENSEN, District Judge.

This case requires the Court to examine factual and legal issues stemming from allegations of reverse discrimination. On May 27, 1992, this Court heard defendant's motion for summary judgment. Cynthia E. Gitt of Epstein, Becker & Green appeared for de-

1. These statutes proscribe employment discrimination on account of race, color, religion, sex, or national origin. *Id.* § 2000e–2.

2. The procedural and factual background of this action has been set forth in the Court's prior

fendant Philippine Airlines, Inc. Lawrence Ball and Louis A. Highman appeared for plaintiffs Fred Lemnitzer and Ken Green. Having considered the papers submitted, the arguments of counsel, the applicable law, and the entire record herein, the Court GRANTS defendant's motion for the following reasons.

## I. BACKGROUND

This is an action brought by two former employees of defendant Philippine Airlines, Inc. ("PAL") alleging wrongful termination on the basis of age and national origin in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*[1] ("Title VII"); the California Fair Employment and Housing Act ("FEHA"); and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626; and other pendent state claims. Both plaintiffs are U.S. citizens who are not of Filipino national origin.[2]

Defendant is a foreign corporation, headquartered in Manila, and a subsidiary of the Republic of the Philippines. PAL provides cargo and passenger service between the United States and the Philippines, using airports in Los Angeles, San Francisco, and Honolulu ("line cities") for departures and arrivals en route to or from Manila. PAL is prohibited from transporting passengers between U.S. cities.

Since September 1987, Rodolfo Llora, Regional Vice President for the Americas, has overseen U.S. operations from the regional office of San Francisco. Mr. Llora, in turn, has reported to the Senior Vice President for Marketing and the Vice President of Marketing in Manila, who in 1988 were Jose Maria Estrada and Rene Ocampo, respectively. Prior to the summer of 1988, PAL also maintained district sales offices in fourteen cities in North America: Miami; Washington, D.C.; New York; Toronto; Chicago; Detroit; Dallas; Houston; San Diego; Los Angeles; San Francisco; Seattle; Honolulu; and Vancouver, British Columbia. Each office was headed by a district and/or area

Order, *see Lemnitzer v. Philippine Airlines,* 783 F.Supp. 1238 (N.D.Cal.1991) ("August 23, 1991 Order"), but is largely repeated here for convenience.

sales manager. In addition to the district sales offices, there were certain marketing functions performed on behalf of all districts by managers in San Francisco. One such function was the Tours and Charters department.

PAL frequently filled certain sales and other key management positions with persons hired or trained in the Philippines, who were expected to return to the Philippines or go to any international destination to which they were assigned, and who were deemed "loyal" to the interests of PAL. This policy translated into a practice of preserving key managerial positions for persons who were citizens of the Philippines and/or participants in a group of managers who rotate from the Philippines to various positions around the world [hereinafter referred to as "expatriates"]. However, over the years PAL has also appointed U.S. citizens of Filipino origin and U.S. citizens of non-Filipino origin to such key positions.

Plaintiff Fred Lemnitzer ("Lemnitzer") began work for PAL on or about April 21, 1969 and worked continuously for PAL until his termination effective September 30, 1988. He held various management positions during that time and his last position was that of Tours and Charters manager in San Francisco.

Plaintiff Ken Green ("Green") worked continuously for PAL from on or about April 19, 1976 until his termination on September 30, 1988. He held management positions throughout this time. Green transferred from the Washington, D.C. office to the Detroit office in July 1988.

On or about August 8, 1988, PAL announced that it was closing all of its district sales offices in the United States outside of California and Hawaii due to financial losses stemming from PAL's U.S. operations and that it would be abolishing several other positions throughout its U.S. operations. Llora, under the direction of Estrada and Ocampo, was directed to eliminate unnecessary costs to cut the losses. This cost reduction involved terminating 114 PAL employees, including the plaintiffs. PAL informed Lemnitzer in June 1988 that it would be abolishing the position of Tours and Charters manager, as well as the Tours and Charter

department. Green was notified in August 1988 that his position would be terminated effective September 30, 1988. Many of the expatriates whose positions were abolished were reassigned to posts outside the United States.

Plaintiffs filed this action on August 8, 1990, alleging the following causes of action: (1) national origin discrimination in violation of Title VII; (2) age discrimination in violation of the ADEA; (3) national origin discrimination in violation of the FEHA; (4) age discrimination in violation of the FEHA; (5) wrongful termination in breach of employment contract; (6) wrongful termination based on national origin discrimination in violation of the California Constitution; and (7) wrongful termination in violation of California public policy.

In a previous Order, this Court granted partial summary judgment for the defendant and ruled that the Air Transport Agreement ("ATA"), which was negotiated by the United States and the Republic of the Philippines and which governs the respective rights of PAL and U.S. carriers to operate in the other's country, "permits PAL to prefer its citizens at key positions ... without implicating the national origin provisions of Title VII." 783 F.Supp. at 1245. Thus, defendant's preference for its own citizens did not violate either Title VII or the FEHA. Nor did defendant's decision to assign employees to positions outside the United States support plaintiffs' Title VII or FEHA theories. *Id.* at 1245.

PAL now moves for summary judgment on all causes of action. Plaintiffs concede that summary judgment should be granted on their age discrimination claims. Plaintiffs' Opposition to Summary Judgment, May 13, 1992, at 13–14.

## II. GENERAL LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, a district court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Recognizing that summary judgment motions can contribute significantly to the resolution of litigation when there are no factual issues, the Supreme Court and the Ninth Circuit have established the following standards for consideration of such motions: "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, *'specific facts* showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (quoting Fed.R.Civ.P. 56(e) (emphasis added) and citing *Kaiser Cement Corp. v. Fischbach & Moore, Inc.,* 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). With respect to these specific facts offered by the non-moving party, the court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the non-moving party. *T.W. Elec. Serv.,* 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Rule 56(c) nevertheless requires this Court to enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 321, 106 S.Ct. at 2552. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient: "[T]here must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). This Court thus applies to either a defendant's or plaintiff's motion for summary judgment the same standard as for a motion for directed verdict: "[W]hether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*

## III. DISCUSSION

### A. National Origin Discrimination Claims

1. Special Legal Standard for Summary Judgment on Discriminatory Termination Claims

■ In a case raising claims of discriminatory termination, plaintiffs bear the initial burden to establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 251, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Once the plaintiffs establish a prima facie case, the burden of production shifts to the defendant to come forward with evidence that the plaintiffs were terminated for a non-discriminatory reason. *McDonnell Douglas,* 411 U.S. at 801, 93 S.Ct. at 1824. After defendant carries this burden, the burden of production shifts back to the plaintiffs to establish that defendant's asserted reasons are merely pretextual. *Id.* at 802, 93 S.Ct. at 1825. The failure of the plaintiffs to come forward with specific facts that establish the existence of a prima facie case renders a grant of summary judgment appropriate. *Stallcop v. Kaiser Foundation Hospitals,* 820 F.2d 1044, 1050–51 (9th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987); *Jurado v. Eleven–Fifty Corp.,* 813 F.2d 1406, 1409 (9th Cir.1987); *Yartzoff v. Thomas,* 809 F.2d 1371, 1374 (9th Cir.1987). Direct evidence of intentional discrimination carries plaintiffs' prima facie burden. *Palmer v. United States,* 794 F.2d 534, 537 n. 1 (9th Cir.1986).

■ In the "traditional" discrimination case, a plaintiff who lacks direct evidence of discrimination may still establish a prima facie case of discriminatory termination by proving: (1) that he is a member of a protected class of persons; (2) that he was qualified for his position; (3) that his employment was terminated; and (4) that his employer replaced him with a person who was not a member of plaintiff's protected class. *See McDonnell Douglas,* 411 U.S. at 801, 93 S.Ct. at 1824.

However, in this case, plaintiffs are members of a traditionally favored group. Plaintiffs are male, non-Filipino U.S. citizens. In the face of a so-called "reverse discrimination" claim, a number of courts have applied a modified *McDonnell Douglas* standard. *See Notari v. Denver Water Dep't,* 971 F.2d 585, 588–89 (10th Cir.1992); *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir.1985); *Parker v. Baltimore & Ohio R.R.,* 652 F.2d 1012, 1017 (D.C.Cir.1981). The need for modifying the standard stems from the premise underlying the *McDonnell Douglas* standard. The *McDonnell Douglas* standard regarding prima facie proof was created in response to legislative efforts to "address this nation's history of discrimination against racial minorities, a legacy of racism so entrenched that we presume acts, otherwise unexplained, embody its effect." *Murray,* 770 F.2d at 67. Although Title VII prohibits racial discrimination against all groups, *see McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 274, 278, 96 S.Ct. 2574, 2576, 2578, 49 L.Ed.2d 493 (1976), "the majority plaintiff who asserts a claim of racial discrimination in employment does so within the historical context of the Act." *Murray,* 770 F.2d at 67.

■ Under the modified test, majority plaintiffs may establish a prima facie case of reverse discrimination by showing: (1) "that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority" and (2) "that the employer treated differently employees who were similarly situated but not members of the protected group." *Id.*

Despite making it clear that Title VII protects individuals who are members of historically or socially favored groups, the U.S. Supreme Court has not addressed whether the showing required to state a prima facie case must be modified or altered in a reverse discrimination case.[3] *See Notari,* 971 F.2d at 588. Other courts have expressly rejected the modified *McDonnell Douglas* test applied in *Parker* and *Murray. See, e.g., Collins v. School Dist. of Kansas City,* 727 F.Supp. 1318, 1322 (W.D.Mo.1990) (holding that the modified test was unacceptable, stating that it is "simply unconscionable for the courts to erect this arbitrary barrier which serves only to frustrate those who have legitimate Title VII claims").

■ The Ninth Circuit has not explicitly adopted the modified *McDonnell Douglas* standard.[4] Although this Court considers the modified test a better yardstick by which to measure reverse discrimination cases, the Court will leave such a determination for the Circuit when it has an opportunity to do so.[5] Accordingly, this Court will apply the traditional *McDonnell Douglas* test.

3. The Supreme Court did find that a reverse discrimination case challenging a county transit board's voluntary affirmative action plan fit "readily within the analytical framework set forth in *McDonnell Douglas* ...." *Johnson v. Transportation Agency, Santa Clara County,* 480 U.S. 616, 626, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987).

4. The Ninth Circuit has followed the Supreme Court's lead in *Johnson,* stating that, in a reverse discrimination case challenging a city's affirmative action program, the case "fits within the analytic framework established in *McDonnell Douglas* ...." *Higgins v. City of Vallejo,* 823 F.2d 351, 355 (9th Cir.1987).

5. The Court notes that defendant would still be entitled to summary judgment if the modified *McDonnell Douglas* test was applied. Under the modified standard, plaintiffs could establish a prima facie case of national origin discrimination by showing: (1) that background circumstances support the suspicion that PAL is that unusual employer who discriminates against the majority, and (2) that PAL treated differently employees who were similarly situated but not members of the protected group. *See Murray,* 770 F.2d at 67.

As for the first element, plaintiffs have two primary allegations to support their claim that PAL discriminates against non-Filipino U.S. citizens. First, plaintiffs proffer statistical evidence that PAL's managers are largely Filipino or U.S. citizens of Filipino origin. Statistical evidence can be used to support a suspicion that a defendant discriminates against the majority. *See Rivette v. United States Postal Serv.,* 625 F.Supp. 768, 772 (E.D.Mich.1986). Second, plaintiffs offer a remark from former PAL president Roman Cruz for evidence supporting a suspicion that defendant discriminates against the majority. Plaintiffs allege that in 1982 Cruz announced at a sales meeting in Manila that PAL intended to implement a company-wide policy of "Filipinizing" PAL's management throughout the world, stating that he wanted PAL to be a Filipino company run by Filipinos for the Filipinos of the world. Plaintiffs' Opposition to Summary Judgment, May 13, 1992, at 9.

■ Once a prima facie case has been established and the defendant has articulated a nondiscriminatory reason for its actions, a plaintiff must come forward with specific evidence that indicates that the nondiscriminatory reason is pretextual. Failure to come forward with specific facts on the issue of pretext that would constitute admissible evidence at trial is grounds for entering summary judgment. *See Mundy v. Household Fin. Corp.*, 885 F.2d 542, 546 (9th Cir.1989) (citing *Cotton v. City of Alameda*, 812 F.2d 1245, 1248 (9th Cir.1987)); *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir.1983); *see also Burdine*, 450 U.S. at 251, 101 S.Ct. at 1093 (requiring plaintiff to prove pretext by a "preponderance of evidence"); *McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. at 1826 (permitting challenge to nondiscriminatory explanation through the use of "competent evidence"). There is no reason why the evidence presented by plaintiffs to establish a prima facie case cannot also be used to prove that defendant's nondiscriminatory explanation is pretextual. *See, e.g., Diaz v. American Tel. & Telegraph*, 752 F.2d 1356, 1363 n. 8 (9th Cir.1985).

■ When judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party. *T.W. Electric*, 809 F.2d at 630–31 (citing *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513). However, there are limits to the admissibility of evidence offered to support or defeat a motion for summary judgment. Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publishing Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979); *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49 (2nd Cir.1985). Thus, in Title VII cases, summary judgment has been granted where the only evidence of discrimination consisted of a conclusory affidavit that lacked "concrete, relevant particulars." *Forsberg v. Pacific Northwest Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir.1988); *Lim v. Citizens Sav. & Loan Ass'n*, 430 F.Supp. 802, 814 (N.D.Cal.1976). In addition, hearsay statements found in affidavits are inadmissable. *Fong v. American Airlines, Inc.*, 626 F.2d 759, 762–63 (9th Cir.1980) (hearsay inadmissable in summary judgment over Title VII claim). Plaintiffs must ultimately persuade the Court in opposing summary judgment that they will have sufficient admissable evidence to justify going to trial.

2. Prima Facie Showing—Application of the McDonnell Douglas Test

■ Plaintiffs may establish a prima facie case of national origin discrimination by showing: (1) that they are members of a protected class of persons; (2) that they were qualified for their positions; (3) that their employment was terminated; and (4) that their employer replaced them with people who were not members of plaintiffs' protected class. *See McDonnell Douglas*, 411 U.S. at 801, 93 S.Ct. at 1824.

a. *Protected or Cognizable Class Under Title VII*

■ As a preliminary matter in establishing a prima facie Title VII case, plaintiffs

Defendant challenges this evidence, arguing that the statement is simply not tantamount to evidence that plaintiffs were discriminated against in connection with their layoffs years later under a different president and, in any event, the statement is inadmissable hearsay. Defendant's Reply in Support of Summary Judgment, May 20, 1992, at 22–23.

The Court agrees that Cruz's 1982 remark is not sufficient evidence to demonstrate discrimination years later. However, the comment, as an admission by one authorized to make a statement concerning the subject, *see* Fed.R.Evid. 801(d)(2)(C), does raise a suspicion that PAL may be that unusual employer that discriminates against the majority. Further, plaintiffs' statistical evidence of PAL's management, even if disputed, though not corrected by defendant, also raises a suspicion that PAL may discriminate against the majority. Although actual evidence of discrimination is lacking, only a suspicion of discrimination needs to be sparked in order for plaintiffs to satisfy this element of the modified *McDonnell Douglas* test. Accordingly, plaintiffs would be able to fulfill this element of their prima facie showing.

However, plaintiffs would not be able to demonstrate the second prima facie element, which is to show that PAL treated employees who were similarly situated, but not members of the protected group, differently. *See Murray*, 770 F.2d at 67. This element is discussed in detail below as the fourth prong of the traditional *McDonnell Douglas* test.

must demonstrate that they are members of a protected or cognizable class of persons eligible to receive protection under Title VII. Both plaintiffs and defendant skip this threshold inquiry, each assuming that plaintiffs, as caucasian American males, or more appropriately for this motion, as non-Filipino U.S. citizens, are members of a cognizable class. Specifically, plaintiffs allege that they have been discriminated against on the basis of their national origin.

However, the August 23, 1991 Order precluded plaintiffs from complaining of potential preferential treatment afforded to Filipino citizens and to those assigned positions outside the United States. This would seem to leave only one group with which plaintiffs could compare their treatment and argue it was disparate—U.S. citizens of Filipino origin.

 As a result, plaintiffs' argument must be that they were discriminated against in favor of U.S. citizens of Filipino origin. National origin claims under Title VII traditionally consider groups of those born outside the United States.[6] Here, plaintiffs allege reverse discrimination, which is actionable under Title VII. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278–82, 96 S.Ct. 2574, 2578–79, 49 L.Ed.2d 493 (1976). However, rather than allege that citizens of another nation are being treated better than them, which is foreclosed by the ATA, plaintiffs argue that fellow U.S. citizens are awarded preference because of Filipino origin.[7] Whether plaintiffs, as non-Filipino U.S. citizens, are a cognizable group under Title VII when complaining of disparate treatment as compared to U.S. citizens of Filipino origin is a novel issue.[8]

However, neither party has addressed the issue and this Court need not decide the question at this time because, even assuming that plaintiffs are members of a cognizable group, they nonetheless are not entitled to their requested relief for reasons explained below. Accordingly, for purposes of this Order, the Court will assume that plaintiffs are members of a protected class entitled to raise a Title VII claim.

b. *Qualified for Positions*

Plaintiffs must next demonstrate that they were qualified for their positions at PAL. Both sides agree that plaintiffs were qualified for their positions. Thus, plaintiffs have satisfied this portion of their prima facie case.

c. *Employment Terminated*

The third element of plaintiffs' prima facie case is to show that their employment was terminated. No dispute exists as to this element as plaintiffs were plainly terminated. Therefore, plaintiffs have met this element as well.

d. *Final McDonnell Douglas Element—Different Treatment of Similarly Situated Filipino Employees*

 The fourth and final prong of the *McDonnell Douglas* test requires plaintiffs

---

**6.** There is a dearth of authority regarding national origin. *Thomas v. Rohner–Gehrig & Co.*, 582 F.Supp. 669, 674 (N.D.Ill.1984). The term national origin "on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287 (1973) (holding that since the term "national origin" does not embrace citizenship, it is not illegal to discriminate on the basis of citizenship).

**7.** In other words, plaintiffs allege to be members of a class that may or may not be cognizable. For a more stark example, consider the following: If a female plaintiff alleges gender discrimination and her employer employs both male and female employees, she can clearly be a member of a cognizable class entitled to protection under Title VII. On the other hand, if a female plaintiff alleges gender discrimination and her employer only employs female employees, her claim must be dismissed since she is not a member of a cognizable class entitled to relief because all the employees were female and, therefore, a claim of gender discrimination would have no basis in law. In this case, plaintiffs compare their treatment vis a vis other U.S. citizens. The distinction plaintiffs make is between U.S. citizens of Filipino origin and U.S. citizens of non-Filipino origin. It is thus subject to debate as to whether plaintiffs are members of a cognizable class under Title VII.

**8.** Arguably, because a court is not to look at citizenship in considering national origin, but rather the country of one's ancestors, *see Espinoza*, 414 U.S. at 88, 94 S.Ct. at 336, a cognizable distinction does exist from the disparate treatment afforded Filipino Americans as opposed to non-Filipino Americans, and thus plaintiffs in this case would be members of a cognizable group for Title VII.

to show that PAL replaced them with people who were not members of their protected class. However, since plaintiffs cannot establish this part of the test because they were not replaced by U.S. citizens of Filipino origin, it is necessary to adapt the *McDonnell Douglas* test to better consider plaintiffs' national origin claims. Such modification is proper because the *McDonnell Douglas* test should be flexibly applied. *See Burdine*, 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6. Accordingly, for plaintiffs to meet the fourth element of the standard, they must show that PAL treated employees who were similarly situated, but not members of their protected group, differently. In other words, plaintiffs need to show that similarly situated Filipino employees were treated differently than them.

To reduce costs, PAL closed all ten of its U.S. district sales offices located outside of California and Hawaii. The Tours and Charters department in San Francisco was also closed. The class of similarly situated employees this Court will examine is necessarily comprised of the sales office managers not located in California and Hawaii and the tours manager from San Francisco, all of whom were terminated because all of their offices were closed. At the time the layoffs were announced, the sales offices located in Dallas and Washington, D.C. were not staffed with a manager. Thus of the eleven closed offices, nine managers were terminated.

Four of the nine terminated managers were non-Filipinos:

| | | |
|---|---|---|
| 1. | Detroit | plaintiff Green |
| 2. | San Francisco | plaintiff Lemnitzer |
| 3. | New York | Mr. Colisemo |
| 4. | Vancouver | Mr. Halley |

Two of the nine discharged managers were Filipino citizens:

| | | |
|---|---|---|
| 5. | Miami | Mr. Gomez |
| 6. | Toronto | Mr. Ormachea |

These two Filipino managers were repatriated to the Philippines for placement in PAL outside of the United States. Given the Court's prior summary judgment ruling, these two managers will be factored out of the Court's analysis of alleged discrimination. The expatriates are not similarly situated with the plaintiffs.

Three of the nine terminated managers were U.S. citizens of Filipino origin:

| | | |
|---|---|---|
| 7. | Houston | Mr. Carlos Gonzalez |
| 8. | Chicago | Mr. Jackie Gonzalez |
| 9. | Seattle | Mr. Crame |

There is no dispute that Mr. Carlos Gonzalez and Mr. Crame were terminated outright. Mr. Jackie Gonzalez was offered and accepted a six-month consulting contract with PAL, but his relationship with PAL was terminated after that six-month period.

Therefore, on the most basic level, seven similarly situated managers were terminated—four were non-Filipino citizens and three were U.S. citizens of Filipino origin. This evidence does not support an inference, let alone proof, that similarly situated Filipino managers were treated differently than plaintiffs. In fact, it demonstrates that all similarly situated employees, whether of Filipino origin or not, were treated similarly. However, plaintiffs present further claims challenging this conclusion.

First, plaintiffs argue that because Mr. Jackie Gonzalez was offered a consulting contract, this shows disparate treatment. However, the consulting contract was limited to a six-month period, after which Mr. Jackie Gonzalez's complete termination took effect. While the consulting contract may have eased the effect of the termination, Mr. Jackie Gonzalez was terminated nevertheless.

Second, plaintiffs argue that Filipino managers were given an opportunity to transfer out of the closing offices to positions that would not be terminated. Plaintiffs contend that Mr. Delfin Tan, a Filipino citizen, was originally slated to replace plaintiff Green in the Washington, D.C. sales office, but that Mr. Tan was actually placed in the Honolulu sales office, which did not close. The "evidence" cited by plaintiffs for this contention says nothing about whether Mr. Tan was originally slated for the Washington, D.C. office. *See* Plaintiffs' Separate Statement Responding To Material Facts, May 13, 1992, at 46:28–47:4; Lemnitzer Declaration, ¶ 15; Green Declaration, ¶ 13.

Plaintiffs also contend that Mr. Crame, a U.S. citizen of Filipino origin, was offered the sales manager position in San Diego, which was not closed. Crame did not agree to the

transfer and was terminated when the Seattle sale office closed. Defendant argues that these transfer offers cannot give rise to any inference of disparate treatment. Defendant contends that the transfer offers were part of the regular "cross-posting" of managers and that they preceded the decision to close offices by more than two months. Viewed in a light most favorable to plaintiffs, there may be at most a hint from the evidence that PAL knew of the office closures well in advance of the announcement and attempted to "stack" the soon-to-be closed offices with non-Filipinos. However, this scintilla of evidence is wholly conclusory and does not constitute sufficient evidence on which a jury could reasonably find for the plaintiffs.

■ Third, plaintiffs raise a statistical argument.[9] Plaintiffs argue that approximately fifty percent of PAL's managers in the United States were either U.S. citizens of Filipino origin or Filipino citizens as of 1976. By June 1988, twenty-eight of thirty-four managers in the United States, or eighty-two percent, were either Filipino citizens or U.S. citizens of Filipino origin. By January 1989, after the August 1988 layoffs, plaintiffs claim that only one manager of twenty-four was not a Filipino citizen or a U.S. citizen of Filipino origin. Plaintiffs' Opposition to Summary Judgment, May 13, 1992, at 10.

Defendant contests these statistics, arguing that they are drawn from unnamed sources and offered without interpretation or explanation as to why the non-Filipinos left the company. See Defendant's Reply in Support of Summary Judgment, May 20, 1992, at 20–21. Defendant does not, however, offer a revised statistical comparison of its Filipino and non-Filipino managers.

Even assuming that these statistics are accurate, they do not supply evidence of PAL's discrimination or assist plaintiffs in meeting their prima facie showing because PAL treated similarly situated Filipino employees equally by discharging all similarly situated employees, including the plaintiffs. Plaintiffs' statistics do not show a "stark pattern" of discrimination unexplainable on grounds other than national origin. See Palmer v. United States, 794 F.2d 534, 539 (9th Cir.1986). Plaintiffs' statistical figures do not change the fact that all similarly situated employees were treated alike.

In conclusion, plaintiffs have failed to show that defendant treated similarly situated managers of Filipino origin differently than plaintiffs. Accordingly, plaintiffs have failed to establish a prima facie case of discrimination. For this reason, defendant is thus entitled to summary judgment.

3. Articulated Nondiscriminatory Reasons for PAL's Decision to Terminate Plaintiffs

■ If a plaintiff has established a prima facie showing of discrimination, the burden of proof then shifts to the defendant to rebut the discrimination claim, generally with evidence of a legitimate business reason for the employer's actions. Burdine, 450 U.S. at 253–255, 101 S.Ct. at 1094–95.

■ Here, plaintiffs cannot even demonstrate a prima facie case of discrimination. However, even assuming that plaintiffs could demonstrate a prima facie case of discrimination, the defendant would still be entitled to summary judgment because PAL had a valid, nondiscriminatory reason to terminate the plaintiffs.

Defendant maintains that plaintiffs were discharged solely because of PAL's economic difficulties. The facts support defendant's position. PAL had been losing money for years and implemented a program to cut costs. The closure of off-line sales offices in the United States was one part of its reduction plan. Another decision was to eliminate the Tours and Charters office. Defendant claims that closing the Tours and Charter office was reasonable because there had really been no tours to the Philippines for the previous five years and that any remaining functions of the Tours manager could simply be performed by the remaining district sales managers. In addition, defendant eliminated its Chicago flights and eliminated all of

---

**9.** Statistical studies may serve "an important role" in establishing a prima facie case in discrimination suits. International Bhd. of Teamsters v. United States, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977).

PAL's ground handling personnel at all of the remaining airports used by defendant. The reduction program displaced both Filipino and non-Filipino employees. Even the plaintiffs do not seriously dispute the fact that PAL was experiencing economic difficulties.

Based on PAL's financial woes, the Court is satisfied that PAL terminated plaintiffs for a legitimate, nondiscriminatory reason; namely, the reduction of its workforce to cut costs. Hence, even if plaintiffs could muster a prima facie case, defendant is still entitled to summary judgment because of its legitimate business reason for terminating the plaintiffs.

■ However, plaintiffs nevertheless argue that defendant's asserted financial difficulties are merely pretextual and that PAL truly intended to discriminate against them on the basis of national origin. Plaintiffs offer several arguments to show pretext, none of which are persuasive. Plaintiffs must lose on their pretext theory because they have submitted no competent evidence that could be used at trial to prove by a preponderance of the evidence that their termination was a pretext for discrimination. *See Burdine*, 450 U.S. at 251, 101 S.Ct. at 1093.

Plaintiffs first argue that plaintiff Lemnitzer was replaced by a Filipino. PAL justified its termination of Lemnitzer on the basis that his office, the Tours and Charters office in San Francisco, would be abolished. Plaintiffs contend that the office, in fact, was not abolished, and that Lemnitzer's former duties were assumed by a Filipino employee, Ms. Evelyn da Rosa, who worked with Lemnitzer in the office.

Plaintiffs' evidence in support of this contention is extremely weak. Lemnitzer declares that after his termination, he met Ms. da Rosa at San Francisco International Airport and she represented that she was on her way to a convention in Las Vegas. Lemnitzer declares that attending conventions was "one of the functions" he carried out in his position. Lemnitzer Declaration, ¶ 18. Lemnitzer also declares that Ms. da Rosa told him that she had responsibility for tours. *Id.* Aside from hearsay objections, this "evidence" does not support an inference that

Ms. da Rosa replaced Lemnitzer. Plaintiffs concede that Ms. da Rosa performed clerical functions relating to tours prior to Lemnitzer's termination. Evidence that she somehow assumed Lemnitzer's duties is lacking. Nor does any evidence exist which suggests that the Tours and Charters office remained open.

Second, plaintiffs claim that plaintiff Lemnitzer was asked to become the district manager of sales in the New York office in early summer of 1988. Shortly thereafter, Lemnitzer was told that the New York office was being closed as was his position in Tours and Charters in San Francisco. Plaintiffs claim that these facts support a claim of discrimination because PAL attempted to send Lemnitzer to a soon-to-be closed office. When Lemnitzer balked at transferring to New York, plaintiffs continue, PAL decided to close the Tours and Charters office. Plaintiffs provide absolutely no evidence for this position. Instead, plaintiffs rely solely on conjecture and conclusions. Such unsubstantiated speculation of an ulterior motive does not create a jury issue. *See Crosier v. United Parcel Serv., Inc.*, 150 Cal.App.3d 1132, 1139, 198 Cal.Rptr. 361 (1983); *Van Komen v. Montgomery Ward & Co.*, 638 F.Supp. 739, 741 (C.D.Cal.1986).

Third, plaintiffs claim that they were denied their "bumping" rights. PAL maintains a Policies and Procedures Manual ("PPM"). Section 31 of the PPM states that seniority and the ability to perform the work required for the job shall govern in cases of filling of layoffs. Section 26, entitled "Reduction in Force," provides a three-step bumping procedure for employees who do not wish to accept layoff. Plaintiffs complain that they were denied bumping rights and that this evidences defendant's intent to discriminate.

Defendant contends that the PPM applies only to non-managerial, rank and file PAL employees, and does not apply to PAL managers. Plaintiffs argue that the PPM does apply to managers. Plaintiffs' evidence consists mainly of testimony by other PAL managers who stated in general terms that employment was governed by the PPM. However, none of these managers testified that the seniority and bumping procedures ap-

plied to managers. Moreover, plaintiffs admit that they know of no managers who were ever permitted to bump. In fact, no evidence exists that any manager, Filipino or non-Filipino, was permitted to exercise the bumping policy.

Even if the PPM applies, defendants argue in the alternative that the termination of the plaintiffs was consistent with the PPM because plaintiffs were either not qualified for such positions or because the positions were considered "key" positions falling under article 8(2) of the ATA.

Plaintiffs' have no adequate evidence concerning the bumping policy on which to base their pretext argument. The belief of other managers that the PPM applied is insufficient to raise a triable issue of fact. Even if the PPM permitted bumping for managers, the fact that no managers were able to bump junior employees defeats plaintiffs' discrimination claims because it demonstrates that all managers were treated similarly.

■ Fourth, plaintiffs raise Cruz's 1982 comment concerning the "Filipinization" policy of PAL. Although this stray remark may raise a suspicion of discrimination, it certainly provides no competent proof of discrimination. Indeed, the statement was uttered six years before the staff reductions and such a distant comment cannot constitute proof supporting a claim of discrimination. Moreover, Cruz was no longer PAL's president during the time of the terminations and was in no way a participant to the decision to reduce costs. The remark just does not amount to evidence of discrimination and the plaintiffs have no evidence linking the comment to their termination.

■ Finally, plaintiffs renew their statistical argument that the percentage of non-Filipino managers has decreased. Again, as discussed above, the economic difficulties facing PAL resulted in the termination of both Filipino and non-Filipino managers. Plaintiffs' statistical proffer does not amount to competent evidence that could refute the fact

that PAL's decision to terminate the plaintiffs was based on economics, not prejudice.

■ In conclusion, even if a prima facie case could be made, plaintiffs have not proffered sufficient evidence in connection with their pretext claim to survive a directed verdict at trial in favor of the defendant. PAL had a legitimate and nondiscriminatory reason to discharge the plaintiffs. Accordingly, plaintiffs' claims of national origin discrimination are without merit and summary judgment is appropriate.[10]

### B. *Wrongful Termination Claims*

Plaintiffs allege wrongful termination in breach of employment contract and wrongful termination in violation of California public policy.

#### 1. Wrongful Termination in Breach of Employment Contract

■ Plaintiffs allege breach of both an implied and an express employment contract. Plaintiffs argue that an implied-in-fact promise existed that plaintiffs would not be terminated without just cause. Plaintiffs base this conclusion on the totality of the parties' relationship. *See* Plaintiffs' Complaint, Aug. 8, 1990, at 11, ¶ 42.

Even if plaintiffs could only be terminated for good cause, which defendant contests, plaintiffs have no evidence that the decision to discharge employees was not a legitimate business decision. *See Malmstrom v. Kaiser Aluminum & Chem. Corp.*, 187 Cal.App.3d 299, 321, 231 Cal.Rptr. 820 (1986) (undisputed evidence of economic reasons for staff reduction is good cause); *Clutterham v. Coachmen Indus.*, 169 Cal.App.3d 1223, 1227, 215 Cal.Rptr. 795 (1985). The Court finds that defendant made a legitimate business decision in terminating the plaintiffs. Therefore, the breach of an implied employment contract claim must be summarily dismissed

---

**10.** Although the discussion of plaintiffs' national origin discrimination claims has focused on their Title VII claim, their discrimination charges based on the FEHA and California Constitution must also be summarily dismissed. *See Ibarbia v. Regents of Univ. of Cal.*, 191 Cal.App.3d 1318, 1326–27, 237 Cal.Rptr. 92 (1987) (FEHA claim resolved by examining federal Title VII law). Plaintiffs rely on the same facts and allegations for all three of their discrimination causes of action. For the same reasons defendant prevails on the Title VII discrimination claim, it must also prevail on the FEHA and California Constitution discrimination claims.

because defendant had good cause to terminate plaintiffs.

 Plaintiffs' express contract claim stems from their reliance on PAL's PPM. As described above, plaintiffs argue that the PPM permitted them to bump more junior employees in case of staff reductions. Claiming that personnel policy manuals constitute part of the employment contract, *see Kerr v. Rose*, 216 Cal.App.3d 1551, 1561–62, 265 Cal. Rptr. 597 (1990), plaintiffs complain that they were denied their PPM bumping rights.

Defendant insists that the PPM applies only to non-managerial, rank and file PAL employees, and does not apply to PAL managers. Plaintiffs aver that the PPM does apply to managers. At best, plaintiffs present only slight evidence to indicate that the PPM applies to managers by alleging that a few PAL managers stated in general terms that employment was governed by the PPM. However, none of these managers testified that the seniority and bumping procedures applied to managers. In fact, these managers specifically deny that bumping polices applied to managers. *See* Defendant's Reply in Support of Summary Judgment, May 20, 1992, at 6–7, 15. Moreover, plaintiffs admit that they know of no managers who were ever permitted to bump. In short, plaintiffs simply cannot summon enough evidence on which a jury could reasonably find for them on the express contract claim.

 Further, even if the PPM applies to managers, plaintiffs present no competent evidence that they would even be entitled to bump junior employees. First, any bumping procedure would be subject to the ATA, which allows defendant to bring in its own employees into certain "key" positions, which can include sales managers. Second, plaintiffs have not presented legitimate evidence showing that they were qualified to fill the non-sales positions that existed after the staff reduction, which were station manager, station engineer, duty engineer, cargo manager, supervisor, and assistant supervisor. Plaintiffs have supplied no evidence as to their specific experience or training that would meet the requirements of these positions. Plaintiffs have just not provided sufficient evidence to create a material dispute of fact concerning their express contract claim. Ac-

cordingly, summary judgment is both proper and fitting.

2. Wrongful Termination in Violation of Public Policy

Plaintiffs argue that because they were terminated based on their national origin, defendant has violated the public policy of California with the wrongful discharge. Because this Court has concluded above that plaintiffs were not terminated based on their national origin and that defendant is entitled to summary judgment, plaintiffs' wrongful discharge claim is without basis. Accordingly, summary judgment is granted on this cause of action.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Defendant's motion for summary judgment on all of plaintiffs' causes of action is GRANTED.

IT IS SO ORDERED.