T. Patrick HANNON, Plaintiff,

v.

Shirley CHATER, Commissioner of the
Social Security Administration,
Defendant.

Civ. No. C 94–20351 EAI.

United States District Court,
N.D. California.

May 26, 1995.

T. Patrick Hannon, Campbell, CA, plaintiff, in pro. per.

Lance Burrow, Mitchell, Stock & Burrow, San Jose, CA, for plaintiff.

Michael J. Yamaguchi, U.S. Atty., San Francisco, CA, William F. Murphy, Asst. U.S. Atty., San Jose, CA, for defendant.

**MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART CROSS–MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT**

INFANTE, United States Magistrate Judge.*

## I. Introduction and Background

This is an employment discrimination lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). Plaintiff T. Patrick Hannon[1] complains that he was passed over for an administrative law judge ("ALJ") position in the Social Security Administration ("SSA") because he is a white male.

Presently before the Court are the parties' cross-motions for summary judgment, and Hannon's motion for leave to amend his Complaint so as to assert a claim for violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq. Having considered all matters of record,[2] the cross-motions for summary judgment are granted in part and denied in part, and Hannon's motion for leave to amend is denied.

## II. Undisputed Facts

### A. Application for ALJ Position

Plaintiff Hannon is a white male[3] who sought an administrative law judge position with the SSA.[4] In March 1993 the Office of Hearing and Appeals ("OHA"), within the SSA, submitted a request for ALJ candidates to the Office of Personnel Management ("OPM").[5] OPM produced a list of 135 ALJ candidates, designated as "Amended Certificate AJ–93–05".[6] By regulation, in filling a given ALJ position, OHA must select from the top three candidates on the OPM list for each such position.[7] After an individual list-

---

* The action is before a magistrate judge by explicit written consent of the parties, filed June 10, 1994. See 28 U.S.C. § 636(c).

1. Hannon, an attorney, is representing himself in this litigation. He has also associated co-counsel.

2. The cross-motions for summary judgment, and the motion for leave to amend, were all heard on May 8, 1995. Hannon's summary judgment motion was brought first and set for hearing on November 14, 1994. The Government brought a cross-motion for summary judgment for the same hearing date, and then Hannon requested a continuance pursuant to Fed.R.Civ.P. 56(f). The motions were continued to March 20, with allowance for supplemental briefing. The Government thereafter noticed a motion for judgment on the pleadings for hearing on January 23, 1995, contending that Hannon had failed to exhaust administrative remedies with respect to his disparate impact claim. See Fed.R.Civ.P. 12(c). Both parties introduced evidentiary submissions on the Rule 12(c) motion and, accordingly, the Court treated the motion for judgment on the pleadings as one for summary judgment pursuant to Rule 56 and re-set the hearing for March 20. So as to permit Hannon certain additional discovery, the motions were sua sponte continued to May 8, 1995, with allowance for a second supplemental round of briefing. Thereafter, Hannon moved for leave to amend his Complaint so as to assert a cause of action under the APA. This last motion, upon Hannon's ex parte request, was set for hearing in tandem with the summary judgment motions. Order, filed April 5, 1995. Finally, the parties were given leave for a third supplemental round of briefing, this time on the validity vel non of the defense's affirma-

tive action plan. See Order, filed April 27, 1995. The motions were taken under submission on May 8, 1995.

3. Declaration of T. Patrick Hannon ("Hannon Decl."), filed October 12, 1995, ¶ 2 and Exhibit A (Defendants' Response to Plaintiff's First Set of Requests for Admissions, Nos. 67 and 68); and ¶ 14.

4. Complaint, filed May 25, 1994, at ¶ 1; Answer, filed August 30, 1994, at ¶ 1.

5. See Deposition Transcript of John Flannery, director of the Office of ALJs for OPM ("Flannery Depo.Tr."), at 41:18–42:17 and Exhibit 12 (copy of "Request for Referral of Eligibles", dated March 24, 1993).

6. Hannon Decl., filed October 12, 1994, ¶ 9 and Exhibit K (copy of Amended Certificate AJ–93–05 produced by the defense during discovery). An OPM "certificate" refers to "a list of eligibles from a register submitted to an appointing officer so that he [or she] may consider the eligibles for appointment". 5 C.F.R. § 332.102(a).

7. 5 C.F.R. § 332.404. "This is the so-called 'rule of three'." Scalia, "The ALJ Fiasco—A Reprise", 47 U.Chi.L.Rev. 57, 60 n. 18 (1980). Craig Pettibone, the former assistant director for the ALJ office at OPM, testified at his deposition that "the agency [OHA] is entitled to pick any one of the three and there are no written criteria which they follow". Deposition Transcript of Craig Pettibone ("Pettibone Depo.Tr."), dated March 30, 1995, at 15:12–13. Pettibone, however,

ed on an OPM certificate is passed over for three ALJ positions, the applicant is not eligible to be considered for another ALJ position.[8] Hannon was ranked, or "rated" in the Government's terminology, 48th of the 135 candidates considered by OHA for ALJ positions nation-wide; Hannon's aggregate score was 88.75, compared with a top score of 97.92 (rated 1/135) and a bottom score of 85.94 (rated 135/135).[9] The ratings broadly comprise four components:

> "[1] [a] [s]upplemental qualification statement where [the applicant] describe[s] [his or her] experience, [2] [a] written demonstration exercise where [the applicant] analyze[s] a case, [3] . . . a reference check that's sent out to people familiar with the applicant's work, and [4] . . . a panel interview with a judge and an attorney and an OPM official usually moderates that panel." [10]

The criteria for OPM's ratings are not otherwise established by the parties.[11]

Hannon sought a position in California, within which ALJ positions were available in Downey, Los Angeles, Oakland, Pasadena, San Bernadino, San Jose, and San Rafael.[12] Consistent with the regulations, and within OPM's discretion, Hannon was considered for three positions: (1) position seven in Los Angeles, for which he was the second-rated candidate; (2) position twelve in Los Angeles, for which he was the top-rated candidate; and (3) position sixteen in San Bernadino, for which he was the second-rated candidate.[13]

In or about June 1993, OHA announced its selections. Hannon was not selected for any of these three positions.[14] "Higher-rated" white males were chosen for positions number seven and sixteen.[15] A *lower*-rated white

would appear to lack personal knowledge of the procedures beyond 1990 or early 1991, when he left his post in OPM's ALJ office. *See id.*, at 7:2–7; 78:3–79:3.

8. *Id.*, § 332.405.

9. *See* Hannon Decl., filed October 12, 1994, ¶ 9 and Exhibit K (Amended Certificate AJ–93–05).

10. Pettibone Depo.Tr., at 76:13–20. Veterans and disabled veterans receive preference points. *Id.*, at 76:21–77:8. Although Hannon is a veteran, he admits he was neither entitled to nor afforded a veteran's preference.

11. Justice, then Professor, Scalia more fully described the rating system in a 1980 law review article: "Under present procedures the [OPM] assigns each applicant up to sixty points for his [or her] experience, and up to forty points on the basis of evaluations (usually written) from person under whom or with whom the applicant has worked. [¶] Applicants are also given a rudimentary test of their decision-writing ability, and are interviewed for about one-half hour by a panel composed of an OPM representative, an administrative law judge and a member of the practicing bar; these steps can result in an upward or downward adjustment of the applicant's score, though rarely by more than five points. And, finally, of course, a representative of the agency (usually the Chief Administrative Law Judge) reviews the records of, interviews, and may make further inquiries regarding the three candidates whose names are forwarded by the OPM." Scalia, *supra*, 47 U.Chi.L.Rev. at 60. Of course, the system which prevailed fifteen years ago may no longer be in force, and Justice Scalia's scholarly writings are not a substitute for

actual evidence of the specific criteria employed at the time of the events at issue.

12. *See* Hannon Decl., filed October 12, 1994, ¶ 9 and Exhibit K (Amended Certificate AJ–93–05); Murphy Decl., filed October 31, 1994, Exhibit H (same, including "Location Key"). The California locations are designated by two codes: "A9" and "D9". Hannon's name is accompanied by "Y" or "yes" designations for both these codes but no others.

13. *Id.* Hannon, who practices law in San Jose, was apparently not considered for the available ALJ position in that city because, consistent with the regulations, he was permitted to be considered for only three openings on a single certificate. *See* 5 C.F.R. § 332.405. He insinuates that OHA manipulates the order in which available positions are filled to increase the chances for selection of minorities and women. OPM's Pettibone acknowledged at his deposition that such manipulation is a theoretical possibility. Pettibone Depo.Tr., at 151:2–8. Yet, there is no evidence whatsoever that this was actually done with respect to Amended Certificate AJ–93–05. Nor is there evidence that OHA was required to consider an applicant for the most geographically-proximate available position.

14. Hannon Decl., ¶ 13; *see also* Declaration of Assistant U.S. Attorney ("AUSA") William F. Murphy ("Murphy Decl."), filed October 31, 1994, Exhibit I (Memo from Suzanne Kroll ["Kroll Memo"] to [unidentified first name] Starnes regarding ALJ selectees [listing individuals offered positions by race and gender]).

15. Murphy Decl., filed October 31, 1994, Exhibit I (Kroll memo). Position twenty-two in San

female, who scored 88.48 (rated 54/135), was chosen for position number twelve in Los Angeles.[16] Jose Anglada, OHA's Deputy Chief ALJ, attests that he recommended the female candidate for selection because of her superior qualifications:

> "[She] was selected for the position based on [her] wealth of judicial experience ... [Her] work as a temporary judge was extensive and varied. Her ability to work in a high volume adjudicatory setting was especially valued because OHA is the system of federal administrative adjudication with the largest volume cases. [¶] In addition to her judicial experience, which I considered to be a valuable and significant factor to her selection to the position, [she] had other legal experience which I considered favorably. While serving as a temporary judge, [she] was also an adjunct law professor and taught a juvenile law course at Southwestern University School of Law in Los Angeles. She had prior work experience as a senior judicial attorney for the California Court of Appeals, as a deputy city prosecutor in Pasadena, an associate editor for the Lawyers Co-operative Publishing Co., and an author of a number of articles in bar association publications. In sum, [she] presented to us a candidate with a rich and varied combination of demonstrated judicial skills, academic and scholarly credentials and practical experience ... [¶] While I did not personally interview [her], prior to making my recommendations for selections, I discussed her interview with [the ALJs] who conducted the interview. [One ALJ] advised that [she]

presented herself extremely well during the interview and showed that she is a person well equipped to handle the administrative law judge position.... We were also informed from our check of her references that the people that she worked with thought she was 'great'.... Her interview and her experience and background made her a very attractive candidate." [17]

The unstated implication is that these qualities were not measured in her "rating", which, as noted, fell *below* Hannon's top rating.[18] Indeed, Anglada concedes in his declaration:

> "While her experience and interview were the most important factors in my recommending her for the position, *the fact that she was a women [sic] was a factor in her favor as well.* While the numbers and percentages have fluctuated over the years, our corps of ALJs has been, and is now, predominately white males. Our latest statistics show we have 1034 ALJs; of that total, 84.14 [percent] are white males. We are interested in attracting qualified women and other unrepresented minorities to the OHA so that our ALJ corps represents the widest range of life experiences that truly reflect the society we live in.... [R]egardless of gender, it is my opinion that [s]he was an excellent candidate based on her experience and personal skills as reflected in her interview. *Th[e] fact that she is a female only heightened our interest in her.*" [19]

The female applicant declined the offer of position twelve in Los Angeles, and the OHA,

---

Jose, for which Hannon was not considered, was also offered to a "higher-rated" white male. *Id.* A "higher rating" apparently correlates with a *lower ranking* on the certificate. Thus, Hannon's ranking of 48 out of 135 does not rate as high as, i.e., is inferior to, applicants with ranks of "20, 37 and 44". *See* Pettibone Depo.Tr., at 90:20–91:4 (discussing those considered for the San Jose opening).

**16.** Murphy Decl., filed October 31, 1994, Exhibit I (Kroll memo); *see also* Hannon Decl., filed October 12, 1994, ¶ 9 and Exhibit K (Amended Certificate AJ–93–05). The female applicant scored twenty-seven one-hundredths of a single point lower than Hannon on what appears to have been a 100–point scale and was six ranking spots below Hannon among 135 applicants. In

short, the differential in ratings between the two candidates was slight.

**17.** Declaration of Jose Anglada, Deputy Chief ALJ of OHA ("Anglada Decl."), filed October 31, 1994, at ¶¶ 2–4.

**18.** If Justice Scalia's description of the OPM ratings as they existed fifteen years ago, *see* 47 U.Chi.L.Rev. at 60, remains substantially accurate today, then all of the female applicant's positive qualities were reflected in her rating and, yet, as attractive a candidate as she may have been, Hannon's higher rating indicated that he was, on points, a *more* attractive candidate.

**19.** Anglada Decl., ¶ 5 (emphasis added).

within its discretion, "did not choose anyone else for that position from Certificate AJ–93–05".[20]

## B. *OHA's Affirmative Action Plan*

In September 1988, the OHA adopted an "Affirmative Employment Program Plan" for recruiting minority and women employees, including ALJs.[21] There is no evidence that OHA's Affirmative Action Plan, a sixty-five page written document, was implemented to remedy past discrimination against women or minorities.[22] According to the plan, however, an "analysis" of the OHA's workforce pertinently revealed a "manifest imbalance" disfavoring white and black females among OHA's "professional" employees.[23] Further, the analysis showed a "conspicuous absence" of white, black, Asian and American Indian females and Asian males among the ALJ corps.[24]

The Affirmative Action Plan states its "objective" to increase over a five-year period the numbers of black, Asian and American Indian women, and Asian men, who are ALJs by varying specified percentages.[25] The plan was amended in 1990 to provide for an objective of increasing the percentage of white women by five percent over the ensuing three years.[26] The plan also indicates a "desire" to increase the "low application rate for *all* minority and female EEO groups for the

20. *Id.*, ¶ 6; *see* Pettibone Depo.Tr., at 50:14–51:12 (re OHA's discretion "not to fill an identified vacancy"); 83:3–84:3 ("Q. And assuming now that [the female applicant] turned down the offer, must Social Security offer Los Angeles, downtown, position number 12, to either Mr. Hannon or [the other male applicant], the remaining two? A. No. Q. There's no rule at OPM that says they must? A. No.").

21. *See* Certified Copy of OHA's "Affirmative Employment Program for Minorities and Women: Multi–Year Affirmative Employment Program Plan" ("Affirmative Action Plan", dated September 1988), filed May 8, 1995. The certified copy of the Affirmative Action Plan was filed pursuant to this Court's Order filed April 27, 1995.

22. Instead, the OHA's Affirmative Action Plan appears to have been promulgated pursuant to an October 1987 directive from the Equal Employment Opportunity Commission ("EEOC"). *See* Murphy Decl., filed May 4, 1995, Exhibits A–F and I–L (uncertified copies of portions of EEOC Management Directive 714, dated October 6, 1987) (instructing federal agencies to develop affirmative action plans).

23. Affirmative Action Plan, at p. 13. EEOC Management Directive 714 defines the term "manifest imbalance" as a workforce incidence of a given minority group at a level "substantially below" the level in the civilian labor force. *See* Murphy Decl., filed May 4, 1995, Exhibit F (copy of directive, at p. 6). The Affirmative Action Plan's analysis shows that in fiscal years 1986 and 1987 nearly four of every five OHA employees in grade groups GS 13 through GS 15 were white males, whereas white females comprised only slightly better than one in ten of the GS 13 through GS 15 posts. Affirmative Action Plan, at p. 14. These are apparently the grade levels at which ALJs are, or were, compensated. *See id.*, at p. 42. No comparative data for the civilian labor force is provided.

24. *Id.*, at p. 17. The term "conspicuous absence" is not specifically defined in the Affirmative Action Plan. EEOC Management Directive 714 defines the term as describing a situation where a minority group is "nearly or totally nonexistent from a particular occupation or grade level" in an agency's workforce. *See* Murphy Decl., filed May 4, 1995, Exhibit E (copy of directive, at p. 5). The Affirmative Action Plan's statistical data show that in fiscal years 1986 and 1987, white males held more than 91 percent of the ALJ positions, whereas white women, for example, held slightly less than three percent, roughly equivalent to Hispanic males. This data was then compared to the "national professional labor force". Affirmative Action Plan, at p. 18. The Affirmative Action Plan, however, acknowledges that comparison data is unreliable:

"[I]n the analysis of the ... Administrative Law Judge occupation[], we find that comparison ... against the professional civilian labor force *creates* underrepresentation of minorities and women where they would not exist if th[is] occupation[] w[as] properly compared against the attorney civilian labor force. Comparison against the 1980 attorney civilian labor force would ... reduce the number of EEO groups with conspicuous absence in the Administrative Law Judge occupation to only Asian and American Indian females."

*Id.*, at p. 38 (emphasis in original).

25. *Id.*, at p. 38c.

26. Murphy Decl., filed May 4, 1995, Exhibit M (copy of "Update 6" of undated Affirmative Action Plan) ("The objective for White Females was added to correct an oversight. The objective for White Females of 5.0 percent of the available opportunities reflects their limited availability on the ALJ register.").

position of Administrative Law Judge".[27] Finally, in its "program evaluation", the Affirmative Action Plan concludes:

"OHA has an affirmative action plan in place to increase the representation of women, minorities, and handicapped among our ALJ corps. That plan consists of identifying women, minority and handicapped attorney organizations, and distributing recruitment information at meetings and conferences sponsored by these groups. Our plan also includes a cooperative effort with the Office of Personnel Management (OPM) to improve opportunities for OHA supervisory staff attorneys who are interested in applying for Administrative Law Judge positions. Because OPM and not OHA controls the qualifications and ranking process for ALJ positions, *our role is limited to reaching out to inform potential applicants about ALJ employment opportunities at OHA and OPM's application process.*" [28]

The Affirmative Action Plan lacks an express termination date, and it is not certain whether it remained in effect in 1993.[29] The Government admits, however, that the OHA did not rely on the Affirmative Action Plan in bypassing Hannon for ALJ position twelve in favor of a female candidate.[30]

### C. *Exhaustion of Administrative Remedies*

On August 13, 1993, Hannon filed an informal complaint with OHA's Equal Employment Opportunity ("EEO") counselor.[31] "The informal complaint failed to redress plaintiff's grievances",[32] and so, on November 20, 1993, Hannon filed a formal administrative complaint with the Department of Health and Human Services ("HHS").[33] The administrative complaint avers, inter alia, that Hannon was discriminated against on the basis of gender:

"... I was discriminated against because I am a male. I was not chosen so that one female would be among the ... successful ALJ candidates even though I was ranked first and the woman was ranker [sic] third. If OHA had not selected this one token woman at my expense, there would have been no women chosen. I was a victim of OHA's window dressing." [34]

---

**27.** Affirmative Action Plan, at p. 44. "The data analyzed suggest[ed] that even with recruitment efforts at their best, it [would] remain[] difficult to attract a large number of minority and women applicants because of private sector inducements and the *stringent qualifying criteria* for ALJ certification." *Id.* (emphasis added). The plan expresses a resolve to discuss with OPM officials "whether the stringent requirements for ALJ certification contain artificial barriers which can be eliminated", and if so, to "work with OPM officials to resolve them". *Id.*, at p. 47.

**28.** *Id.*, at pp. 64–65 (emphasis added).

**29.** The plan specifically sets "target" dates for September of 1989, 1990, 1991 and 1992, but not for later years. *Id.*, at p. 38c. On the other hand, the plan—on the very same page—speaks of target dates arising "annually" on September 30 and expressly contemplates a *five-year* timetable for achieving its objectives, *id.*, which would necessarily mean that the Affirmative Action Plan was supposed to continue through September 1993. The patent ambiguity is possibly eliminated if the "target" dates, through September 1992, are understood as periodic dates for evaluating "progress" in an ongoing program, with the final goal being accomplished (or not) by the end of the fifth year, September 1993.

**30.** At the hearing on these motions, the question whether Anglada, the deputy chief ALJ who made the hiring decision, relied upon the Affirmative Action Plan was specifically put to the Government's counsel, AUSA Murphy, who stated that there was "no evidence" in the record that Anglada relied upon the Affirmative Action Plan in Hannon's case, nor did Murphy have reason to believe there was any such reliance. Murphy also conceded that the Affirmative Action Plan's terms do not expressly contemplate OHA hiring decisions but merely address "outreach" efforts.

**31.** Complaint, ¶ 15.

**32.** *Id.*, ¶ 16.

**33.** *Id.; see* Murphy Decl., filed October 31, 1994, ¶ B and Exhibit B (copy of Individual Complaint for Employment Discrimination). AUSA Murphy attests that the document is genuine, but he has not sworn to foundational facts establishing that he has the personal knowledge to authenticate the document. The document, however, bears what purports to be Hannon's signature, and Hannon has not challenged the endorsement as his own.

**34.** *Id.*, Exhibit B (administrative complaint, at p. 11). "Secondly,". Hannon administratively alleged, "I was discriminated against as a veteran. Most veterans who apply for ALJ positions are

Hannon also filed a "Form HHS 652 Final EEO Counseling Report", dated November 12, 1993, together with his administrative complaint.[35] The Form HHS 652 contains a "description" of the administrative complaint prepared by the EEO counselor, which pertinently states:

> "Mr. Hannon feels he is being discriminated against because he is a White Male. He has heard the [unspecified] agency is out to hire women and minorities, although no one will officially admit this or say it on record...."[36]

On January 21, 1994, HHS acknowledged receipt of the administrative complaint.[37] On some indeterminate date, a summary administrative investigation report was prepared.[38] The summary report specifically notes: "Complainant's 'point score' on the register was 88.75. The [competing] female's was 88.48."[39] Nonetheless, the summary report states that the investigation had "adduced no evidence which would sustain Complainant's allegations".[40] The summary report is silent regarding the impact of OHA's Affirmative Action Plan.

## III. *Discussion*

### A. *Summary Judgment Standard*

▮ Summary judgment shall be entered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law determines which

facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

▮ The test used to determine whether the summary judgment motion should be granted mirrors the standard for a directed verdict: "the trial judge must direct a verdict, if under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250, 106 S.Ct. at 2511. Thus, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial' under Rule 56(c)." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge [when] he is ruling on a motion for summary judgment." *Anderson, supra,* 477 U.S. at 255, 106 S.Ct. at 2513.

"Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and *on which that party will bear the burden of proof at trial.*" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (emphasis added). Here, the adverse parties have brought directly competing motions for summary

---

white males. *OHA['s] intent was to discriminate against veterans. The effect was to discriminate against white males." Id.* (emphasis added).

**35.** *See id.,* ¶ A and Exhibit A (copy of Form 652). This document is also not authenticated simply on the basis of Mr. Murphy's attestation.

**36.** *Id.*

**37.** *Id.,* ¶ C and Exhibit C (copy of letter from Bonita V. White, director of HHS Complaints Division, to Hannon, dated January 21, 1994). Again, the document is not properly authenticated.

**38.** *Id.,* ¶ F and Exhibit F (copy of Summary of Investigation of EEO Discrimination Report, without referenced exhibits). It is uncertain

whether the summary report was issued before or after the lawsuit was filed. Hannon alleges that, as of initiating the lawsuit on May 23, 1994 (more than 180 days after filing his administrative complaint on November 20, 1993), HHS had yet to issue an investigative report or summary thereof. Complaint, ¶ 17. The Government formally denies this. *See* Answer, ¶ 17. The issue, however, does not appear to be material to the question whether Hannon exhausted his administrative remedies.

**39.** *Id.,* Exhibit F, (summary investigative report, at unpaginated fourth page).

**40.** *Id.*

judgment, but they do not stand on identical footing. Hannon will bear the burden of proof at trial on his discrimination claims, and the cross-motions are analyzed with this unequal burden in mind.

## B. *Disparate Treatment Claim*

Title VII discrimination claims are governed by a familiar three-part test. "The complainant in a Title VII [action] must carry the initial burden under the statute of establishing a prima facie case of ... discrimination." *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

■ "The burden then must shift to the employer to *articulate* some legitimate, non-discriminatory reason for the employer's rejection." *Id.* (emphasis added). The employer's burden to "articulate" a non-discriminatory rationale is in reality a "burden of 'producing evidence' ". *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (citation omitted); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 257–58, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981) (discussing "defendant's *evidentiary* obligation") (emphasis added). "If the defendant [employer] carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine, supra,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95.

■ Finally, the plaintiff carries the ultimate burden of *persuasion* that the employer's proffered reason for the rejection is pretextual. *McDonnell Douglas, supra,* 411 U.S. at 803–04, 93 S.Ct. at 1825–26.

### 1. *prima facie case*

■ A plaintiff establishes a prima facie case of employment discrimination by showing:

> "(1) [Plaintiff] belongs to a protected group; (2) application was made for the job for which the employer was seeking applicants; (3) despite plaintiff's qualifications for that job, she was rejected; and (4) after plaintiff was rejected, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications."

*Bowman v. Block,* 940 F.2d 1211, 1223 (9th Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991). Hannon has established a prima facie case of disparate treatment.

### a. *member of a protected group*

■ Despite being a white male, Hannon satisfies the first element of the prima facie case. See, *Johnson v. Transportation Agency of Santa Clara County,* 480 U.S. 616, 626, 107 S.Ct. 1442, 1449, 94 L.Ed.2d 615 (1987) (suit brought by male employee claiming gender discrimination "fits within the analytical framework set forth in *McDonnell Douglas,* [*supra* ]"); *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 278, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976) (Title VII applies to any racial group, whether minority or majority).[41]

---

41. By claiming "reverse discrimination", Hannon arguably must satisfy a modified version of the *McDonnell Douglas* prima facie case: "Under the modified test, majority plaintiffs [i.e. white males] may establish a prima facie case of reverse discrimination by showing: (1) 'that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority' and (2) 'that the employer treated differently employees who were similarly situated but not members of the protected group.' " *Lemnitzer v. Philippine Airlines, Inc.,* 816 F.Supp. 1441, 1448 (N.D.Cal. 1992) (Jensen, J.), *aff'd in part, rev'd in part on other grounds and remanded,* 52 F.3d 333, (9th Cir., April 18, 1995) (table; unpublished decision). In *Lemnitzer,* the district court was asked to apply the modified test in a reverse discrimination lawsuit. Judge Jensen noted that while some courts have applied the modified standard, others have expressly rejected it. *Id.,* citing, *Notari v. Denver Water Dep't,* 971 F.2d 585, 588–89 (10th Cir.1992) (applying the modified standard); *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63, 67 (6th Cir.1985) (same); *Parker v. Baltimore & Ohio R.R.,* 652 F.2d 1012, 1017 (D.C.Cir.1981) (same); and *Collins v. School Dist. of Kansas City,* 727 F.Supp. 1318, 1322 (W.D.Mo.1990) (rejecting the modified standard). Because the Ninth Circuit has not adopted the modified standard, Judge Jensen declined to do so and applied the traditional *McDonnell Douglas* test. *Lemnitzer, supra,* 816 F.Supp. at 1448. The Ninth Circuit affirmed Judge Jensen's ruling on the *Lemnitzer* plaintiffs' Title VII claim, without approving or disapproving the decision not to apply a modified standard: "we assume without deciding that the Appellants established a

#### b. *qualified applicant who was rejected*

Hannon also satisfies the second and third elements of the prima facie case. He applied for positions for which the government was seeking applicants.[42] Although Hannon was qualified for an ALJ position,[43] he was not selected for any of the three for which he was considered.[44]

#### c. *position not withdrawn*

■ Hannon also satisfies the fourth and final element of his prima facie case. Contrary to the Government's arguments, to satisfy the fourth element a plaintiff "does *not* have to show that any discrete period of time elapsed between the moment he was rejected and the moment someone else was hired; it is enough ... that the position remained open after the qualified candidate applied for the job, and that someone else was ultimately selected." *Williams v. Edward Apffels Coffee Co.*, 792 F.2d 1482, 1485 (9th Cir.1986) (emphasis added). Each of the three ALJ positions for which Hannon was considered was offered to another eligible candidate. Although Hannon was rejected at the same time someone else was made an offer, the timing is not material.

#### 2. *legitimate, nondiscriminatory reason*

#### a. *positions seven and sixteen*

■ The Government has carried its burden of articulating a nondiscriminatory motive in rejecting Hannon for ALJ positions seven and sixteen. The evidence establishes that both positions were offered to higher-rated white males.

■ Evidence that the person hired is of the same sex or race as the plaintiff "is extremely helpful to the defendant's rebuttal in supporting an nondiscriminatory justification for its employment action. However, it would be a mistake to assume that such evidence amounts to an ironclad defense." Larson, *Employment Discrimination*, § 8.03[6], (2d ed. 1994), at pp. 8–77—8–88; see, *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1534–35 (11th Cir.1984); *Jones v. Western Geophysical Co. of America*, 669 F.2d 280, 284 (5th Cir.1982) (summary judgment inappropriate where issue whether replacement of one black by another was a pretextual device specifically designed to disguise the discrimination); *Rodriguez v. Tom's Foods*, 50 Fair Empl.Practice Cases 1177, 1180, 1987 WL 109071 (E.D.Cal.1987) ("replacement of a female employee by a female employee does not negate a prima facie case of sex discrimination as a matter of law").

Hannon, however, provides no "significantly probative evidence" to rebut the Government's evidence of a nondiscriminatory motive. See *Schuler v. Chronicle Broadcasting Co.*, 793 F.2d 1010, 1011 (9th Cir.1986) ("The plaintiff must ... offer specific and significantly probative evidence that the employer's alleged purpose is a pretext for discrimination."). Therefore, the Government is entitled to summary adjudication of Hannon's claims with respect to these two positions. See *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir.1983) (summary judgment proper where plaintiff "produced no facts which, if believed, would have shown pretext and thus tendered an issue for trial").[45]

---

prima facie case of employment discrimination". 1995 WL 230404. As such, Judge Jensen's rejection of the modified standard remains the law of that case. *See* Ninth Circuit Local Rule 36–3. In this case, Hannon has established a prima facie case under both the traditional and modified standards, and the Court need not elect between them.

42. *See* Hannon Decl., filed October 12, 1994, ¶ 9 and Exhibit K (Amended Certificate AJ–93–05).

43. Hannon does not indicate exactly what an ALJ's qualifications are or how he satisfied them, but, by regulation, his appearance on the Amended Certificate AJ–93–05, means he was "eligible" for appointment. 5 C.F.R. § 332.102(a). *See*

*also*, Hannon Decl., Exhibit D (Declaration of OHA ALJ Patrick R. Maloney, at ¶ 4 ["The ALJs that have come onboard are quality people, and we appreciate having them. I also know T. Patrick Hannon and his abilities are equal to these new judges. I would also appreciate having him as an ALJ."]).

44. Hannon Decl., ¶¶ 10–13.

45. Summary adjudication in favor of the Government is also proper with respect to position twenty-two in San Jose, for the same reason: a higher-rated white male was offered the job and Hannon has not shown that the offer was pretextual. *See* Footnote 15 hereinabove.

### b. *position twelve*

Position twelve (unlike positions seven and sixteen) was not offered to a higher-rated white male, but instead to a lower-rated white female. Further, it is undisputed, based on the sworn testimony of the OHA official who made the hiring decision, that gender played a part in selecting the female candidate for the position:

> "... the fact that she was a woman was a factor in her favor ... [the] fact that she is a female only heightened our interest in her".[46]

Pursuant to § 107(a) of the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071, 1075, consideration of gender as a factor in an employment decision is expressly prohibited.

> "[A]n unlawful employment practice is established when the complaining party demonstrates that ... sex ... was a *motivating factor* for any employment practice, even though other factors also motivated the practice".

42 U.S.C. § 2000e–2(m) (emphasis added).

The 1991 amendment was designed to reverse in part the holding in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), wherein the Supreme Court ruled that in mixed motive cases a "defendant may avoid a finding of liability ... by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account". 490 U.S. at 258, 109 S.Ct. at 1795. The superseding legislation precludes an employer from escaping liability altogether in a mixed motive case.[47] However, pursuant to § 107(b) of the 1991 Civil Rights Act, 105 Stat. at 1075–76, the available relief in a mixed motive case may be more limited:

> "On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates the

respondent would have taken the same action in the absence of the impermissible motivating factor, the court—(i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment ..."

42 U.S.C. § 2000e–5(g)(2)(B); e.g., *Riess v. Dalton*, 845 F.Supp. 742, 744 (S.D.Cal.1993) ("Section 107(b) ... provides limited equitable relief, including attorney's fees and costs, for a Plaintiff who proves a Section 107(a) violation.") *see also*, 42 U.S.C. § 2000e–16(d) (applying same rule to federal employers).

The term "motivating factor" used in the 1991 legislation is the same term used, interchangeably with "motivating part", by the Supreme Court in *Price Waterhouse, supra,* 490 U.S. at 249–50, 109 S.Ct. at 1790. Its derivation can be traced to the Court's analogous constitutional jurisprudence. *See id.,* at 248, 109 S.Ct. at 1789–90 ("We have reached a similar conclusion in other contexts where the law announces that a certain characteristic is irrelevant to the allocation of benefits and burdens."), citing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (equating "motivating" with "substantial" factor). As the Supreme Court explained in *Price Waterhouse:*

> "In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman."

490 U.S. at 250, 109 S.Ct. at 1790. In this case, OHA, through the declaration of Deputy Chief ALJ Anglada, proffered the reasons for its decision to hire a woman instead of

---

46. Anglada Decl., ¶ 5.

47. See, *Estate of Reynolds v. Martin*, 985 F.2d 470, 475 n. 2 (9th Cir.), *reh. denied*, 994 F.2d 690 (1993) ("Section 107 modifies the Supreme Court's holding in *Price Waterhouse* ..."); see also, Loudon, "the Civil Rights Act of 1991:

What Does It Mean and What is Its Likely Impact?", 71 Neb.L.Rev. 304, (1992) ("The Civil Rights Act of 1991 overturns *Price Waterhouse* by providing that any reliance on a discriminatory reason is illegal.").

Hannon, and, in commendable candor, confessed that one of those reasons was that the successful applicant was a woman.

 On the other hand, Title VII's proscriptions against discrimination do not bar employment decisions made pursuant to valid affirmative action policies. *Johnson, supra,* 480 U.S. at 626, 107 S.Ct. at 1449; see also, *Officers for Justice v. Civil Service Comm'n of City and County of San Francisco,* 979 F.2d 721, 725 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993).[48] In Hannon's case, however, the Government denies that OHA's Affirmative Action Plan was actually relied upon as a basis for choosing a lower-rated female candidate for position twelve in Los Angeles.[49] Moreover, the decision to bypass Hannon for the position twelve was beyond the scope of OHA's Affirmative Action Plan. The plan expressly states that efforts to increase minority representation are "limited to reaching out to inform potential applicants about ALJ employment opportunities at OHA and OPM's application process".[50] Of course, the woman offered position twelve

was already in the applicant pool and certified eligible for appointment. There is nothing written in the Affirmative Action Plan which would preference her candidacy by making gender a "factor in her favor".[51]

Accordingly, the Government's motion for summary judgment must be denied.

### 3. 'pretext'

Notwithstanding the Government's failure to carry its burden of articulating a defense, Hannon is not necessarily entitled to judgment in his favor as a matter of law. "If the defendant has failed to sustain its burden but reasonable minds could *differ* as to whether a preponderance of the evidence established the facts of a prima facie case, then a question of fact *does* remain, which the trier of fact will be called upon to answer." *Hicks, supra,* —— U.S. at ——, 113 S.Ct. at 2748 (emphasis in original).

 In this case, reasonable minds cannot differ. The OHA has admitted that considerations of gender played a part in offering position twelve to a female candidate.[52]

---

48. "The [Supreme] Court's past decisions presuppose that some forms of affirmative action are permissible and some are not and that, therefore, some plans can continue and some cannot." Rutherglen, "After Affirmative Action: Conditions and Consequences of Ending Preferences in Employment", 1992 U.Ill.L.Rev. 339, 345. Once an affirmative action plan "is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid". *Johnson, supra* [480 U.S. at 626], 107 S.Ct. at 1449. "[T]he ultimate burden of proving the invalidity of the plan rests with the party challenging its validity." *Cunico v. Pueblo School Dist. No. 60,* 917 F.2d 431, 436 (10th Cir.1990). Note, however, that the new rule regarding mixed motive cases, 42 U.S.C. § 2000e–2(m), "is arguably a direct anti-affirmative action provision, though it probably was not so intended". Note, "The Continuing Evolution of Affirmative Action under Title VII: New Directions After the Civil Rights Act of 1991", 81 Va.L.Rev. 565, 596 (1995).

49. As previously noted, *see* Footnote 30 hereinabove, AUSA Murphy was specifically questioned on this point at the hearing on the instant motions. He represented that there was no evidence in the record of, nor did Murphy have reason to believe there had been, reliance on the Affirmative Action Plan.

50. Affirmative Action Plan, at p. 65.

51. The Court declines to hypothesize whether, under the circumstances prevailing in 1993, OHA *could have* validly formulated an affirmative action policy which would have taken the gender of applicants on OPM Certificate AJ–93–05 into consideration and, if so, the appropriate manner in which gender *could have* been considered. The undisputed facts are that OHA never implemented any such policy.

52. Anglada Decl., ¶ 5. There is a conflict among the circuits following *Hicks, supra,* regarding the level of evidence sufficient to prove that the employer's reason is pretextual. *See,* "Summary Judgment and Title VII After *Hicks:* How Much Evidence Does it Take to Make an Inference?", 28 U.C.Davis L.Rev. 261, 275 (1994). "The circuits agree that a plaintiff must produce evidence supporting at least the prima facie elements of discrimination and evidence that the employer's reason for the discharge is false. The circuits split, however, on whether a plaintiff must produce additional evidence that the employers actual reason for discharging the plaintiff was unlawful discrimination." *Id.,* at 277–78 [footnotes and citations omitted]. The conflict does not come into play in mixed motive cases because " 'it makes no sense to ask' whether the legitimate reason was pretextual"; instead, a plaintiff must merely demonstrate " 'that it is more likely than not that a protected characteristic played a motivating part in (the) employment decision' ". *Washington v. Garrett,* 10 F.3d 1421, 1432 n. 15

As noted above, an employer violates Title VII by taking gender into account in making a hiring decision, even if the employer would have made the same decision on the basis of wholly legitimate criteria alone. 42 U.S.C. § 2000e–2(m). Because OHA is unable to take safe harbor in its Affirmative Action Plan, Hannon is entitled to judgment as a matter of law on his disparate treatment claim.[53]

## C. *Disparate Impact Claim*

■ Hannon has also asserted a "disparate impact" claim, alleging that the OHA has a policy of discriminating against white males.[54] To make out a prima facie case of disparate impact, a plaintiff must identify a specific employer practice or policy that has a significant adverse impact on the plaintiff's racial, ethnic, gender or religious class. *See* 42 U.S.C. § 2000e–2(k).[55]

> "In the typical disparate impact case, in which the plaintiff argues that a selection criterion excludes [a class of] applicants from jobs or promotions, the plaintiff proves discriminatory impact by showing statistical disparities between the number of [ ] class members in the qualified applicant group and those in the relevant segment of the workforce. [citation] While such statistics are often difficult to compile, whether the [given] group has been disadvantaged turns on quantifiable data."

*Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486, *reh. denied,* 13 F.3d 296 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994).

■ Hannon has asserted innumerable OHA practices which he contends ad-versely impact white male ALJ applicants. The only one for which there is any evidence is the OHA's Affirmative Action Plan, which, through its outreach program, preferentially treats women and minorities. The outreach program was deliberately designed to, and may have, altered the gender complexion of the ALJ applicant pool and, thereby, those hired as ALJs. Although there is no evidence in the record on this point, without the outreach program, the successful female applicant for position twelve might never have applied and Hannon would not have been in a position of competing with her. Recruitment programs which have the effect of disparately impacting ethnic or gender groups are actionable. See, *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1436 & n. 3 (9th Cir.) (word-of-mouth recruiting by white superintendents who gave preference to friends and relatives "predictably" resulted in circumstances where "nearly all those hired were white"), *modified on other grounds,* 742 F.2d 520 (1984). However, recruitment efforts instituted pursuant to a valid affirmative action program are allowed. Thus, for Hannon to prevail as a matter of law on his disparate impact claim, he must establish the *invalidity* of OHA's Affirmative Action Plan.

### 1. *validity of affirmative action plan*

An assessment of the legal validity of an affirmative action plan is guided by the standard first enunciated in *Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), a decision which upheld, as "consistent with Title VII's objective of 'break(ing) down old patterns of racial segregation and hierarchy' ", a private employer's

---

(9th Cir.1993) (citations omitted). Here, Anglada's own declaration establishes that gender played a motivating part in his decision not to hire Hannon.

53. Hannon has limited his motion for summary judgment to the issue of liability alone. Plaintiff's Notice of Motion for Partial Summary Judgment, filed October 12, 1994, at p. 2. The appropriate remedy is not addressed in this order and may be circumscribed depending on the Government's ability to convince the trier-of-fact that OHA would have offered an ALJ position to the female applicant regardless of her gender. 42 U.S.C. § 2000e–5(g)(2)(B).

54. Complaint, ¶ 6.

55. The Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071, codifies the disparate impact theory of liability as it existed prior to the Supreme Court's decision in *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). See, *Antonio v. Wards Cove Packing Co.*, 10 F.3d 1485, 1491 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 57, 130 L.Ed.2d 16 (1994) ("The Act significantly modifies the rules that the Supreme Court announced in *Wards Cove*."); *see also* Loudon, *supra,* 71 Neb.L.Rev. 304.

reservation of fifty percent of its new skilled craft trainee slots for black employees until the percentage of black skilled craft persons approximated the percentage of blacks in the local labor force. *Johnson, supra*, 480 U.S. at 628, 107 S.Ct. at 1450, quoting *Weber, supra*, 443 U.S. at 208–09, 99 S.Ct. at 2730. The *Weber* affirmative action plan was found valid because it:

> (1) "did not 'unnecessarily trammel the interests of white employees', since it did not require 'the discharge of white workers and their replacement with new black hirees'";
>
> (2) did not create "'an absolute bar'" to the advancement of white employees; and
>
> (3) "was a temporary measure, not designed to maintain racial [or gender] balance, but to 'eliminate a manifest racial [or gender] imbalance'".

*Johnson, supra*, 480 U.S. at 630, 107 S.Ct. at 1451, quoting *Weber*, 443 U.S. at 208–09, 99 S.Ct. at 2730.

"In determining whether an imbalance exists that would justify taking sex ... into account, a comparison of the percentage of ... women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise". *Johnson, supra*, 480 U.S. at 631–32, 107 S.Ct. at 1452. "Where a job requires special training, however, the comparison should be with those in the labor force who possess the relevant qualifications". *Id.*

> "If a plan failed to take distinctions in qualifications into account in providing guidance for actual employment decisions, it would dictate mere blind hiring by the numbers, for it would hold supervisors to

'achievement of a particular percentage of minority employment or membership ... regardless of circumstances such as economic conditions or the number of available qualified minority applicants ...'"

*Id.*, at 636, 107 S.Ct. at 1454, quoting *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 494–96, 106 S.Ct. 3019, 3060, 92 L.Ed.2d 344 (1986) (O'Connor, J., concurring in part and dissenting in part).

### 2. *Hannon's case*

In the instant case, as discussed above, the OHA's Affirmative Action Plan is designed to increase over a five-year period, and by varying specific percentages, the numbers of women and minorities who are ALJs through "reaching out to inform potential applicants about ALJ employment opportunities at OHA".[56]

### a. *manifest imbalance with labor force*

█ The Government's "latest statistics" indicate that five of every six ALJ's nationwide are white males.[57] Hannon has not shown, nor even suggested, that the entire United States is an inappropriate labor market for purposes of evaluating an affirmative action plan for hiring ALJs for Los Angeles. Nor has he supplied any evidence whatsoever suggesting that the Government's statistics are mistaken or that such statistics are disproportionate to the qualified labor force.[58] Finally, Hannon has not established that women and minorities are not "underutilized" as ALJ's—i.e., that there does not exist a "manifest imbalance" between the percentage of women and minorities who *are* ALJs and the percentage of women and minorities *qualified to be* ALJs. *Id.*[59] Without the

56. *See* Footnotes 21–29 and accompanying text hereinabove.

57. Anglada Decl., ¶ 5.

58. The comparison must be with those in the labor force who possess the relevant qualifications to be an ALJ. See, *Johnson, supra*, 480 U.S. at 631–32, 107 S.Ct. at 1452. The position requires "special training" and other "relevant qualifications": "You have to be a lawyer with seven years of administrative law and/or trial experience". Pettibone Depo.Tr., at 76:6–10.

59. The "underutilization" terminology stems from regulations promulgated by the Office of Federal Contract Compliance Programs ("OFCCP"), which administers affirmative action rules for government contractors. The OFCCP's regulations (and criticism thereof), although not controlling in our case, help to focus the analysis. "'Underutilization' is defined as having fewer minorities or women in a particular job group than would reasonably be expected by their availability." 41 C.F.R. § 60–2.11(b). "OFCCP rules do not give precise standards for judging underutilization, but three basic approaches are possible. [¶] One approach is the 'any difference' standard. If there is *any* difference be-

comparative statistics, Hannon cannot carry his burden of showing, on the basis of the undisputed facts, that OHA's Affirmative Action Plan is invalid.

### b. *unnecessary trammeling*

Hannon has also failed to make any showing establishing that the OHA's Affirmative Action Plan unnecessarily trammels the rights of white male ALJ applicants or creates a bar to their advancement. The OHA's plan is, by its terms, "limited to reaching out to inform potential applicants about ALJ employment opportunities at OHA".[60] Insofar as affirmative action policies are necessary evils, the OHA's plan could hardly be more benign. It does not establish quotas nor set aside positions for women or minorities. Moreover, Hannon did not have an "absolute entitlement" to or "legitimate firmly rooted expectation" of obtaining a position as an ALJ. See, *Johnson, supra,* 480 U.S. at 637–38, 107 S.Ct. at 1455; see also, *Higgins v. City of Vallejo,* 823 F.2d 351, 357 (9th Cir. 1987) (approving municipal affirmative action plan for promoting firefighters where "[o]nly qualified applicants are considered for promotions, and all applicants are entitled to compete against all others"), *cert. denied,* 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989).

### c. *temporary measure*

Finally, Hannon has not offered an iota of proof that the OHA's Affirmative Action Plan is a permanent feature of the OHA landscape which seeks to establish in perpetuity a work force whose sexual composition mirrors that of the relevant labor force. Indeed, to the contrary, Hannon argues that the Affirmative Action Plan lapsed, and was no longer in force, prior to 1993.[61]

In sum, Hannon has not made a showing sufficient to establish the existence of any elements essential to his disparate impact claim, on which he would bear the burden of proof at trial, and as such the Government is entitled to summary adjudication of Hannon's disparate impact claim.[62]

---

tween the relevant group proportions employed and those available in the local labor market, then the group is 'underutilized.' This approach ... has been rejected by several courts. A second approach would be the 'statistically significant' difference standard. If the discrepancy is statistically significant, underutilization is occurring. This approach is suggested in *Hazelwood School Dist. v. United States,* [433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)]. A possible third approach would be a bright-line mathematical rule. For example, a [manifest imbalance] occurs if the level of employment falls below eighty percent of the proportional representation of the group in the local labor market [i.e., if women constitute 50 percent of the market, they must constitute at least 40 percent of a given employer's workforce]. [¶] Whichever test is used, it is clear that each is subject to classification difficulties.... 'Determining (female and minority workforce) availability is a complicated, laborious and time-consuming process. It is *inherently subjective* in many respects and the end product represents a rough estimate at best.'" Ford, "Administering Identity: The Determination of 'Race' in Race–Conscious Law", 82 Calif.L.Rev. 1231, 1247–48 (1994) (emphasis in original; citations and footnotes omitted).

**60.** Affirmative Action Plan, at p. 65. The plan also contemplates efforts to work with OPM officials to eliminate "artificial barriers" to employment of women and minorities among the "stringent" qualifying criteria. *Id.,* at p. 47. Howev-

er, there is no evidence that these efforts ever bore fruit and that the qualifying criteria were revised as a result of the Affirmative Action Plan. Indeed, as previously mentioned, there is no evidence on these motions as to what the qualifying criteria even are.

**61.** *See* Plaintiff's Supplemental Brief re Affirmative Action, filed May 2, 1995, at p. 6 ("The selection process took place during the period April–June 1993. This was after *expiration* of the five year plan!") (emphasis added).

**62.** The Government alternatively contends that it is entitled to summary adjudication of the disparate impact claim because Hannon failed to raise the theory in attempting to exhaust his administrative remedies. Courts are required under Ninth Circuit precedent to construe administrative charges "'with the utmost liberality'". *EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 899 (9th Cir.1994) (citation omitted). The "permissible scope of the civil action" is defined by "the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination". *Serpe v. Four–Phase Systems, Inc.,* 718 F.2d 935, 937 (9th Cir.1983). Here, Hannon administratively alleged that the OHA has had a history of institutionalized discrimination against veterans and that the effect of such discrimination was discrimination against white males. *See* Murphy Decl., filed October 31, 1994, ¶ B and Exhibit B (administrative complaint, at pp. 10–11; *see also* Footnote 34 hereinabove (quot-

**D.** *Motion for Leave to Amend Complaint*

Finally, Hannon has sought leave to amend his Complaint to add a cause of action pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq., for judicial review of OHA's rejection of his ALJ candidacy in 1993.[63] He urges that the OHA acted arbitrarily and capriciously, in violation of the APA.[64] The Government opposes the motion, arguing that the proposed amendment would be futile because, supposedly, Title VII is the exclusive remedy for claims of discrimination in federal employment.[65] The Government also argues that the motion, filed April 5, 1995 and noticed for hearing on May 8, 1995, is unduly delayed.[66]

### 1. *futility of motion*

Leave to amend "shall be freely given when justice so requires". Fed.R.Civ.P. 15(a); see, *Eldridge v. Block,* 832 F.2d 1132, 1135 (9th Cir.1987) (amendments to be granted with " 'extreme liberality' ") (citation omitted). Nevertheless, "futile amendments should not be permitted". *Klamath–Lake Pharm. Ass'n v. Klamath Med. Service Bureau,* 701 F.2d 1276, 1293 (9th Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).

Hannon's proposed amendment is, indeed, futile. Title VII is, as the Government asserts, "an exclusive, preemptive administrative and judicial scheme for the redress of federal employment discrimination". *Brown v. General Services Admin.,* 425 U.S. 820, 829, 96 S.Ct. 1961, 1966, 48 L.Ed.2d 402 (1972); see also, *White v. General Services Admin.,* 652 F.2d 913, 916 (9th Cir.1981).

### 2. *timeliness of motion*

Hannon's motion, is also untimely. The motion was noticed for hearing on May 8, 1995, a week after the May 1, 1995 "motion *hearing* cut-off".[67] Once the district court has issued a pretrial scheduling order establishing a timetable for pretrial motions, Rule 16, not Rule 15, controls the amendment of pleadings. *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 607–08 (9th Cir.1992). Such orders entered before the final pretrial conference "may be modified upon a showing of 'good cause' ". *Id.,* at 608, quoting Fed.R.Civ.P. 16(b). "[The] 'good cause' standard primarily considers the diligence of the party seeking the amendment.... [C]arelessness is not compatible with a finding of diligence and offers no reason to grant relief." *Id.,* at 609.

In this case, as the Government points out, Hannon's APA theory is fully congruent with the facts alleged in his original pleading and should have been included therein. The motion for leave to amend is therefore denied.

### IV. *Order*

Accordingly, IT IS HEREBY ORDERED that (1) Hannon's motion for summary adjudication of his disparate treatment claim is GRANTED with respect to the position twelve (Los Angeles) listed on OPM Certificate AJ–93–05, but Hannon's motion for summary adjudication of his disparate treatment claim is DENIED in all other respects;

(2) the Government's cross-motion for summary adjudication of the disparate treatment claim is GRANTED with respect to positions seven (Los Angeles), sixteen (San Bernardino) and twenty-two (San Jose) listed on OPM Certificate AJ–93–05, but the Government's motion for summary adjudication of the disparate treatment claim is DENIED in all other respects;

(3) Hannon's motion for summary adjudication of his disparate impact claim is DENIED;

---

ing administrative complaint)). Construed with the utmost liberality, Hannon's administrative allegations should reasonably have prompted an investigation of the impact on white males of OHA's facially-neutral hiring criteria as well as the impact of, necessarily non-neutral, affirmative action policies. Hannon, therefore, exhausted his administrative remedies.

**63.** Notice of Motion for Leave to Amend, filed April 5, 1995.

**64.** *See* Proposed Amended Complaint, ¶ 14.

**65.** Defendant's Opposition to Plaintiff's Motion for Leave to Amend, filed April 21, 1995, at pp. 5–6.

**66.** *Id.,* at pp. 2–3.

**67.** Civil Minute Order, filed September 19, 1994 (emphasis added).

(4) the Government's cross-motion for summary adjudication of the disparate impact claim is GRANTED; and

(5) Hannon's motion for leave to amend his Complaint is DENIED.

IT IS SO ORDERED.